KIRK v. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-063-CR

LANCE RAYSHAWN KIRK A/K/A LANCE KIRK APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

Appellant Lance Rayshawn Kirk appeals his conviction for capital murder.  The jury found Appellant guilty, and because the State waived the death penalty, the trial court sentenced Appellant to the statutory requirement of life imprisonment.  
See
 
Tex. Code Crim. Proc. Ann.
 art. 37.071 (Vernon Supp. 2005).  In seven points, Appellant contends that the trial court erred by failing to appoint a second attorney to represent him, by overruling the motion to suppress one of Appellant’s statements to the police, by failing to give properly requested limiting instructions, by admitting hearsay statements, and by excluding statements relative to Appellant’s state of mind.  He also asserts that his trial counsel was ineffective because he failed to immediately ask for a death-qualified lead attorney and failed to object to the admission of Appellant’s statement because of the trial court’s failure to appoint a second attorney to represent Appellant.  We affirm. 

FACTUAL BACKGROUND

On Wednesday, May 28, 2003, Appellant ran a stop sign driving a silver Infiniti.  Officer Myers, a patrol officer with the Fort Worth police department, stopped Appellant for the traffic violation.  Officer Myers entered the license number of the vehicle into his on-board computer before approaching Appellant, who was alone in the car.  Appellant informed Officer Myers that he did not have his driver’s license or proof of insurance, but he provided Officer Myers with his name and birth date.  He told Officer Myers that the car belonged to his aunt.  Appellant informed Officer Myers that he was not in school because he had just gotten out of teen court.  Officer Myers went back to the vehicle to verify the information that Appellant had provided, but when he reached his patrol car, he saw that the computer screen indicated that the Infiniti was wanted in connection with a homicide.

Officer Myers radioed for assistance in making the arrest and returned to Appellant, told Appellant he was going to write him some tickets for failing to have his driver’s license and proof of insurance, and asked Appellant to wait in the backseat of the patrol car.  When Officer Stephens arrived, Officer Myers advised Appellant that he was placing him under arrest.  Appellant jumped out of the car and slammed Officer Myers to the ground with enough force to knock him unconscious.  Appellant was apprehended running through a neighborhood and was arrested for running from the police and injuring the two officers.

The silver Infiniti belonged to Robert and Joan Griswold.  Officers had found the Griswolds dead in their home on May 27, 2003.  The officers had responded to a welfare check at the Griswold home after Joan Griswold failed to come into work and her coworkers were unable to contact her.  Officers found Robert Griswold’s body lying on the dining room floor.  He had been shot twice.  Officers found Joan Griswold’s body lying face down in the hallway. She had been shot in the back of the head once at very close range.

The evidence presented at trial showed that Appellant and Quntione “Montrel” Solomon spent the afternoon of May 24, 2003, at Appellant’s mother’s house.  Appellant’s mother was not there, and Appellant did not have keys to his mother’s house, so the pair used a ladder to enter the house through a second story window.  While there, they showered and played video games.  Appellant informed Montrel that he was going to “borrow a truck” and left Montrel at the house alone.  While Appellant was out, Montrel called his brother two times asking whether he had heard from Appellant.

Around 5:00 p.m. on Saturday, Appellant called his girlfriend, Jennifer Page.  During the conversation, he informed Page that he was going to buy a car.  Although Appellant had mentioned getting an older car, Page knew that Appellant did not have a job and depended on his mother for money.

Sometime between 4:30 and 5:30 that afternoon, Carla Sams answered the doorbell at her house in the Candleridge neighborhood of Fort Worth, and Appellant was standing outside.  He asked her whether Casey stayed there. Sams noticed that as Appellant spoke, he leaned to the side to peer into the house a couple of times.  She informed him that there was no one that lived there by that name, and she shut the door.  She testified that she had not seen a car parked in the street behind Appellant, and she saw him walking towards Candleridge Park as he left.

That same evening Jacqueline Davis, her husband, and a neighbor finished unloading a heavy outdoor grill that they had just purchased.  Davis’ parents’ house was just a short walk up a back alley from her house, right next door to the Griswolds’ home.  One of Davis’ neighbors helped Davis and her husband unload the outdoor grill off of the truck.  Davis escorted her neighbor to the back gate and watched her neighbor walk down the alley to his own backyard. As she did, she noticed a car coming down the alley, “faster than cars usually come down that alley.”  She saw Appellant, alone, driving a silver Infiniti down the alley.

Montrel testified that Appellant returned to his mother’s house around sunset driving a silver Infiniti.  He also had a cellular telephone and credit cards. Montrel testified that one of the cards had Robert Griswold’s name on it.  When Montrel asked Appellant how he got the car, Appellant told him that he got it from a “homeboy.”  Appellant drove the car to the Solomon house, where he and Montrel picked up one of Montrel’s two brothers.  The Solomon brothers were surprised to see Appellant driving the silver Infiniti.  Appellant told Patrick Solomon that the Infiniti belonged to his uncle.

That evening, Saturday, May 24, 2003, Appellant drove Montrel and Kendrick Solomon to a party.  They purchased gas with the credit cards that Appellant had obtained.  During the night, Appellant and his friends used the recently acquired cellular telephone that had belonged to the Griswolds.  Appellant told Kendrick that the cellular telephone was “his friend’s cell phone,” and he allowed Kendrick to use the phone.

On May 25, 2003, Appellant drove Montrel, Kendrick, and Wayne Kirk to the Parks Mall in the Infiniti.  At a Footlocker store, they purchased athletic shoes, sports jerseys, shorts, and a headband using Robert Griswold’s credit card.  After shopping, Appellant treated his friends to a meal at a nearby restaurant.  An Arlington police officer stopped Appellant as he drove the Infiniti in Arlington, but the officer only detained Appellant for a few minutes for the  traffic violation.

The next day, Appellant returned to Footlocker with his friends to buy more clothes, and he continued to use Robert Griswold’s credit cards throughout the weekend to buy gas, groceries, and other items.  The third time that Appellant attempted to charge merchandise from Footlocker on Robert Griswold’s credit card, the charge was declined due to suspicious activity for repeated charges at the same location over a number of days.

Appellant and his friends used the Griswold’s phone throughout the weekend as well, and even programmed it with phone numbers.  Appellant and his friends sent and received more than five hundred thirty calls over the four days that Appellant possessed the phone.

One evening that weekend, Appellant threw away a large number of credit cards near a Whataburger just off of Southeast Loop 820.  The following Wednesday, Joan Griswold’s wallet was found behind a business park near a Whataburger located just off Southeast Loop 820.  The wallet contained Joan Griswold’s drivers’s license, military identification card, Sam’s Club card, and a Bank of America check card.

On Memorial Day, May 26, 2003, Appellant drove the Infiniti to the Solomons’ house to attend a cookout.  Although Appellant parked the car nearby, he moved it before his mother arrived.  On Tuesday, May 27, 2003, Appellant drove some friends to school and then drove himself to traffic court to appear for an earlier traffic violation.  After school, he gave rides to a number of his friends, including his girlfriend Jennifer Page.  Appellant told Page that he had bought the Infiniti for $800.  However, when Page was riding in the Infiniti with Appellant, she noticed that Appellant immediately backed up out of sight down the street just as his mother drove by.  Officers apprehended Appellant the following day.

After Appellant was arrested, he gave three statements to police. Appellant claimed that a high school friend, Landon Phillips, had given him the car, the credit cards, and the cellular telephone; however, the version of how he obtained the items from Phillips differed from statement to statement.  The statements were inconsistent and were contradicted by witnesses, physical evidence, and phone and credit card records.  Detective Brannan testified that Appellant had consistently changed his story to fit the questions that he was asking and the evidence that he confronted Appellant with.

FAILURE TO APPOINT SECOND ATTORNEY

In his first point, Appellant contends that the trial court erred in failing to appoint a second, death- qualified attorney to represent him.  The State asserts that the error, if any, was harmless. 

Appellant was arrested on May 28, 2003, and he was charged with capital murder that day.  The following day, the trial court appointed Appellant’s trial counsel.  On August 20, 2003, Appellant was indicted in cause number 0891414D for the capital murders of Joan Griswald and Robert Griswald committed during the same criminal episode.

Appellant filed a “Motion for Waiver of the Death Penalty and in the Alternative for Second Attorney and Mitigation Specialist” on September 22, 2004.  Therein, Appellant noted that the charges against him had been pending for fifteen months, and he requested that the court either order the State to file a written waiver of the death penalty, or alternatively, appoint a second, death-qualified attorney to represent him.

On September 27, 2004, Appellant was indicted in the case that was eventually tried, cause number 0949990D, for the capital murder of Joan Griswald “in the course of committing or attempting to commit the offense of robbery.”  The State filed a written notice of waiver of the death penalty on November 4, 2004.  On January 14, 2005, Appellant moved for the court to adopt all of the motions filed under the initial cause number into the second cause.  The court granted the motion to adopt on January 19, 2005.  At the same hearing, the trial court also considered Appellant’s motion for waiver of the death penalty.  The trial court noted that because the prosecution had “always assured” the court and defense counsel that the death penalty would be waived in the case, the court had not appointed a second attorney.  The court observed that Appellant’s trial counsel had always been concerned with the possibility that the prosecutor might change his mind and pursue the death penalty without the written document; however, based on the representations that were made by the prosecutor, the court was not concerned with that possibility.  The trial court did not appoint a second attorney to represent Appellant.  

Code of criminal procedure article 26.052(e) provides that

the presiding judge of the district court in which a capital felony case is filed 
shall 
appoint two attorneys, at least one of whom must be qualified under this chapter, to represent an indigent defendant as soon as practicable after charges are filed, unless the state gives notice in writing that the state will not seek the death penalty.

Tex. Code Crim. Proc. Ann.
 art. 26.052(e) (Vernon Supp. 2005) (emphasis added).  The trial court did not appoint two attorneys to represent Appellant between the time he was initially indicted and the time the State gave written notice that it would not seek the death penalty against Appellant, which was approximately seventeen months.  During that seventeen-month time period, Appellant stood accused of capital murder and the State had not filed a written notice that it would not seek the death penalty, yet Appellant was represented by a single attorney.

A failure to comply with article 26.052 is susceptible to a harmless error analysis under rule of appellate procedure 44.2(b).  
Hughes v. State
, 24 S.W.3d 833, 838 (Tex. Crim. App.), 
cert. denied
, 531 U.S. 980 (2000).  Although Appellant was not represented by two attorneys during that time period, he cannot show that the error affected his substantial rights.  
See 
Tex. R. App. P.
 44.2(b).  His case proceeded and was tried as though the State had waived the death penalty immediately upon filing the capital charges against Appellant.  Appellant acknowledges that his trial counsel filed many motions and took other actions on his behalf, and he does not establish any specific instances of misconduct or ineffective assistance of counsel
(footnote: 1) committed by his attorney.  Additionally, the State waived the death penalty in Appellant’s case, and it represented to the court and to Appellant’s trial counsel that it was not seeking the death penalty in this case.  Thus, Appellant has failed to demonstrate that the trial court’s failure to appoint a second, death-qualified attorney has affected his substantial rights.  Accordingly, we overrule Appellant’s first point. 

MOTION TO SUPPRESS

In his third point, Appellant asserts that the trial court erred by denying his motion to suppress the audiotaped statement Appellant gave to police, which was recorded after his trial counsel had been appointed, but before a death-qualified lead counsel was appointed.

1. Standard Of Review

We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard of review.  
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court’s decision, we do not engage in our own factual review.  
Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State
, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); 
State v. Ballard
, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).  Therefore, we give almost total deference to the trial court’s rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.  
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); 
State v. Ballman
, 157 S.W.3d 65, 68 (Tex. App.—Fort Worth 2004, pet. ref’d).  But when the trial court’s rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court’s rulings on mixed questions of law and fact.  
Estrada v. State
, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); 
Johnson
, 68 S.W.3d at 652-53.

When reviewing a trial court’s ruling on a mixed question of law and fact, the court of appeals may review de novo the trial court’s application of the law of search and seizure to the facts of the case.  
Estrada
, 154 S.W.3d at 607.  We must uphold the trial court’s ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling.  
Armendariz v. State
, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), 
cert. denied
, 541 U.S. 974 (2004); 
Ross
, 32 S.W.3d at 856; 
Romero
, 800 S.W.2d at 543.  

2. Evidence Presented

After Appellant was arrested on May 28, 2003, Detective Curtis Brannan of the Fort Worth Police Department met with Appellant and read him his 
Miranda 
rights.
(footnote: 2)  Detective Brannan asked Appellant whether he understood those rights and if he was willing to speak with him without the presence of an attorney.  Appellant informed him that he was willing to speak with him without an attorney present, and he signed the 
Miranda
 warnings form provided by Detective Brannan.  Appellant signed a written statement, offering an explanation for why he was found in the decedents’ vehicle, stating that Landon Phillips had given him the car, as well as the decedents’ credit cards and cellular telephone.

After checking the decedents’ cellular telephone records, Detective Brannan questioned Appellant for a second time that day, pointing out discrepancies and inaccuracies in Appellant’s first statement.  After Detective Brannan again read Appellant his 
Miranda
 rights, Appellant waived those rights and gave a second statement that Detective Brannan recorded on audiotape. After Appellant gave his second statement, he was booked into jail.  At 8:29 p.m. that evening, Appellant appeared before a magistrate, who advised him that he was charged with capital murder and informed him that he had a right to appointed counsel. 
 Appellant requested that the court appoint counsel to represent him, and the court appointed Appellant’s trial counsel on May 29, 2003.

Appellant’s mother, Tracey Harris, contacted Detective Brannan several times to discuss the charges pending against her son.  On May 30, 2003, Harris contacted Detective Brannan and informed him that Appellant had more information and that he wanted to speak with the detectives.  This telephone conversation between Detective Brannan and Harris was recorded on audiotape. Detective Brannan informed Harris that he could not initiate contact with Appellant, and that if Appellant wanted to speak with him, he would need to initiate the contact.  Harris informed Detective Brannan that Appellant was attempting to contact the detective at that time.

Detective Brannan got Appellant out of jail and brought him into the interrogation room, where he again informed Appellant of his 
Miranda
 rights. Appellant acknowledged that he had an attorney, but stated that he wanted to speak with Detective Brannan.  According to Detective Brannan, Appellant “was very anxious to--to talk and tell his version of why he was driving around in these dead people’s car, and using their cell phone and credit cards.  He was very anxious to talk.”  At the beginning of the interview, the following discourse occurred:

[Detective Brannan]:  Okay, I received a call earlier today asking, being advised by [your] mother, Ms. Harris, that you wish to speak to us again.  Is that correct?

[Appellant]:  Yes sir. 

[Detective Brannan]:  And, did you pass that message on to her?

[Appellant]:  Yes sir.

[Detective Brannan]:  To pass on to us?

[Appellant]:  Yes sir. 

[Detective Brannan]:  And you are initiating this, in other words you are requesting to talk to me again about this case that you are in jail for without the presence of your attorney here.  Is that correct?

[Appellant]:
  Yes sir. 

[Detective Brannan]:  And who is your attorney that’s been appointed to you?

[Appellant]:  Uh, Boone something. 

[Detective Brannan]:  Okay Mr. Boone and have you got to talk to him?

[Appellant]:  Yes sir.

Detective Brannan then gave Appellant his 
Miranda
 warnings, and he asked Appellant to initial each warning on a form listing the 
Miranda
 rights.  Appellant complied.  He also signed the signature line on the 
Miranda 
form. Detective Brannan then asked Appellant what he wanted to talk about, and Appellant responded, “I want to talk to you about my case.”  Detective Brannan asked, “Okay what questions do you have about it?  Then I’ve got some questions for you.  So I’ll let you go first.  How is that?”  Appellant stated: 

All right I want to know—I need to know how how is my bail reduction and everything.  I tried, I talked to my lawyer about it but he had said that he was going to be out of town so it was going to take a little while.  And about the statement I ain’t suppose to do that and all without his presence and all of that stuff.  So basically I want to get to the point—to the point that I can go on and get home to my baby.

Detective Brannan responded:

Well your attorney told you what most any attorney would.  I don’t know what his schedule is about being in town or out of town.  Attorneys don’t like for people to talk to the police without them being present for whatever reasons they do that.  Sometimes we talk to witnesses.  Sometimes we talk to suspects and people that are in custody.  And we as the police try to hear what you have to say and then go back and check those things out.  And that’s some of the things I want to talk to you about because you had told me about this kid named Landon that you knew in junior high or from high school.  Is that right?

Detective Brannan then proceeded to question Appellant regarding the incident in question, and he never discussed Appellant’s bail with him.  Detective Brannan explained that there was no evidence that Landon Phillips, the man whom Appellant alleged had given him the car, phone, and credit cards, “was involved in this.”  He asked Appellant about being stopped by the Arlington police, and he confronted Appellant about the times the calls were made on the Griswolds’ cellular telephone.  The detective questioned Appellant about his knowledge of DNA and how far he went into the Griswolds’ home.  Appellant answered all of the detective’s questions without protest.  The last thing that Appellant stated during the interview was, “I just want to go home.”

3. The Trial Court’s Findings Of Fact And Conclusions Of Law
  

The trial court found that Appellant was seventeen years old, but he was of sufficient sophistication to understand and waive his rights.  The trial court determined that Appellant was in custody when he gave the third statement, and a magistrate advised him of his rights as required by code of criminal procedure article 15.17.  
See 
Tex. Code Crim. Proc. Ann.
 art. 15.17 (Vernon Supp. 2005).  The trial court found that there was no indication that the contact was initiated by anyone other than Appellant, with or without Harris’ encouragement.  The court found that its determination was supported by Appellant’s responses to Detective Brannan’s questions during the interview.

4.  Applicable Law

Once the Sixth Amendment attaches, government efforts to elicit information from the accused, including interrogation, represent “critical stages” to which the Sixth Amendment applies.  
Michigan v. Jackson
, 475 U.S. 625, 630, 106 S. Ct. 1404, 1408 (1986); 
Lemmons v. State
, 75 S.W.3d 513, 520 (Tex. App.—San Antonio 2002, pet. ref’d).  The State has the burden to prove Appellant knowingly, intelligently, and voluntarily waived his Sixth Amendment right to counsel.  
See Jackson
, 475 U.S. at 633, 106 S. Ct. 1404; 
Lemmons
, 75 S.W.3d at 520.  The court of criminal appeals has recognized a two-step process to show that an accused has waived his previously invoked right to counsel.  
Cross v. State
, 144 S.W.3d 521, 526-27 (Tex. Crim. App. 2004). This waiver is based on the rule established by the United States Supreme Court in 
Edwards v. Arizona
, 451 U.S. 477, 101 S. Ct. 1880 (1981). 
Cross
, 144 S.W.3d at 526-27.  In 
Edwards
, the Court held that “an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police.”  
Edwards
, 451 U.S. at 484-85, 101 S. Ct. at 1885. 

Although 
Edwards 
dealt with the Fifth Amendment right to counsel, it was extended by the Court to the context of the Sixth Amendment.  
See Jackson
, 475 U.S. at 636, 106 S. Ct. at 1411 (concluding that the assertion of the right to counsel is no less significant when the basis of the assertion is the Sixth Amendment); 
see also Holloway v. State
, 780 S.W.2d 787, 790 (Tex. Crim. App. 1989) (recognizing the extension of 
Edwards 
to the Sixth Amendment context). 

In 
Oregon v. Bradshaw
, 462 U.S. 1039, 1044-46, 103 S. Ct. 2830, 2834-35 (1983), the Supreme Court clarified 
Edwards 
and established a two-step process to determine whether a suspect has waived his previously invoked right to counsel.  As explained by the Court of Criminal Appeals in 
Cross
, the first step requires proof that the suspect himself initiates further communication with the police after invoking his right to counsel.  
Cross
, 144 S.W.3d at 527.  The second step requires proof that, after the suspect reinitiates communication with the authorities, the suspect validly waives the right to counsel.  
Id.  
Although 
Cross 
involved the Fifth Amendment, there is no reason this rule should not be extended to the context of the Sixth Amendment, based on the reasoning of the 
Jackson
 Court.  
Hargrove v. State
, 162 S.W.3d 313, 322 (Tex. App.—Fort Worth 2005, pet. ref’d); 
see Jackson
, 475 U.S. at 632, 106 S.Ct. at 1408-09 (stating that the Sixth Amendment right to counsel requires at least as much protection as the Fifth Amendment right to counsel).  Therefore, in the present case, the State was required to prove that Appellant reinitiated contact after he requested appointment of counsel at his article 15.17 hearing and that he validly waived his right to counsel.  
Cross
, 144 S.W.3d at 527; 
Hargrove
, 162 S.W.3d at 322.  

Here, Appellant invoked his right to counsel by requesting the appointment of counsel at the article 15.17 hearing that was held after formal charges were filed against him.  
See Hargrove
, 162 S.W.3d at 321.  As the trial court noted in its findings of fact, Appellant then reinitiated contact with Detective Brannan by having Harris call Detective Brannan.  When Appellant had the opportunity to speak with Detective Brannan again, he confirmed that he requested that his mother contact Detective Brannan and pass along the message that he wanted to initiate a conversation with the detective.

Appellant asserts that he merely contacted Detective Brannan because he wanted to discuss his bond and custodial status and not the investigation as a whole.  In 
Cross
, the court of criminal appeals explained that the critical inquiry is whether the suspect was interrogated before the suspect initiated the further contact with law enforcement officials.  
Cross
, 144 S.W.3d at 529.  If he was not, 
Edwards 
is not violated.  
Id.
  A suspect’s invocation of his right to counsel acts like a protective 
Edwards 
bubble, insulating him from any further police-initiated questioning.  
Id.
  Only the suspect himself can burst that bubble by both initiating communications with police and expressly waiving his right to counsel.  
Id.
  Once that bubble is burst, however, 
Edwards 
disappears, and the police are free to reinitiate any future communications and obtain any further statements as long as each statement is voluntarily made after the waiver of 
Miranda 
rights.  
Id.

Appellant relies upon 
Mays v. State
, 
726 S.W.2d 937, 946 (Tex. Crim. App. 1986), 
cert. denied
, 484 U.S. 1079 (1998) (citing 
Bradshaw
, 462 U.S. at 2385, 103 S. Ct. at 1883) for the proposition that an accused initiates a conversation under 
Edwards
 only by remarks which can fairly be said to represent a desire to open up a more generalized discussion relating directly or indirectly to the investigation. 
 In 
Bradshaw
, the Court clarified that

there are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.  Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally “initiate” a conversation in the sense in which that word was used in 
Edwards
.

Bradshaw
, 462 U.S. at 1045, 103 S. Ct. at 2835.  Appellant contends that his statement to Detective Brannan that he wanted to discuss his bail reduction is not an inquiry that would be fairly said to represent a desire on his part to open up a more generalized discussion relating directly or indirectly to the investigation. 

When Detective Brannan asked Appellant what he wanted to speak with him about, Appellant responded, “I want to talk to you about my case.”  During the third statement, Appellant acknowledged that while making “small talk” before the interview, Detective Brannan had indicated that he wanted to show Appellant “some pictures and things” in order to “run down and check all the leads” that Appellant might provide.  Although Appellant did initially only ask Detective Brannan about the bail reduction, the context of the entire exchange suggests that Appellant did not intend to limit the discussion to the issue of his bail reduction.  In light of Appellant’s two prior statements, wherein he attempted to diminish his involvement in the murders, Appellant’s insistence that he wanted to “talk about [his] case” is a statement that can  fairly be said to represent a desire to open up a more generalized discussion relating directly or indirectly to the investigation.  
See Mays
, 726 S.W.2d at 946.   

Thus, giving deference to the trial court’s factual findings, we hold that the trial court did not abuse its discretion in determining that Appellant had initiated contact with Detective Brannan.  Because Appellant initiated the contact with Detective Brannan, the first prong of 
Edwards
 has been satisfied.  We must next determine whether Appellant validly waived his right to counsel.  
See
 
Cross
, 144 S.W.3d at 526-27. 

Appellant had been given his 
Miranda
 rights prior to giving his two initial statements, and the magistrate again read Appellant his rights at the arraignment.  At the beginning of the interview, Detective Brannan asked Appellant, “you are requesting to talk to me again about this case that you are in jail for without the presence of your attorney here.  Is that correct?”  Appellant responded affirmatively.  Then Detective Brannan again informed Appellant of his 
Miranda
 rights immediately before Appellant gave him the third statement.  Detective Brannan also gave Appellant a form that listed the 
Miranda
 rights, and Appellant initialed next to each of the rights listed and signed the form.

Appellant had not been deprived of food, drink, or sleep.  Appellant acknowledged during the interview that the officers had not promised him any benefits for making a statement, nor had they threatened or coerced him into participating in the interview.  Giving due deference to the trial court’s findings of fact and viewing the totality of the circumstances, we hold that the trial court did not abuse its discretion in finding that Appellant voluntarily waived his rights.  Thus, the second prong of the 
Edwards
 test was satisfied.  
See Cross
, 144 S.W.3d at 527.  Accordingly, we overrule Appellant’s third point.

HEARSAY 

In his fifth and sixth points, Appellant asserts that the trial court erred by admitting hearsay statements made by the detectives when they were taking Appellant’s statements and by denying Appellant’s request for a limiting instruction regarding those statements.  The State asserts that the detectives’ statements were not hearsay because the statements were not offered to prove the truth of the matter asserted.  

We review a trial court’s ruling to admit or exclude evidence under an abuse of discretion standard.  
Green v. State
, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996)
; 
Montgomery v. State
, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh’g).  If the court’s decision falls outside the “zone of reasonable disagreement,” it has abused its discretion.
  Rankin v. State
, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996) (op. on reh’g); 
Montgomery
, 810 S.W.2d at 391.

Rule 801(d) of the Texas Rules of Evidence provides that hearsay “is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”  
Tex. R. Evid.
 801(d).  Appellant complains of Detective Brannan’s statements, “There is no evidence that exists right now that Landon was involved in this,” and, “I feel like maybe you’ve been a little untruthful with me.  We went out and we picked up Landon . . . .”  He also complains of Detective Brannan’s statement, “If we had a person who—if we had a person who was telling us that they saw you walking alone to this house.  What would you think about that . . . . If we had a person that saw you leaving that house with that vehicle what would you think of that?”

Prior to the trial court’s publication of the tape recorded statements to the jury, Appellant objected to the admission of the statements on the ground that  the statements included hearsay.  Appellant also requested that the court include an instruction stating, “In the presentation of statements by [Appellant], please keep in mind that words of Detective Brannan and others are not the statement of [Appellant] and are not any evidence that the matter asserted in those words are in fact true.”  The trial court denied his request.  Prior to the publication of the first tape recorded statement, the trial court instructed the jury that the transcript of the tape was merely an aid to assist them in listening to the tape, and if there were any differences between the tape and the transcript, the jury was to rely solely on the tape and not what was on the transcript.  Prior to the publication of the second tape recorded statement to the jury, Appellant renewed his previous objections, including his hearsay objection, and for a second time, he requested the same jury instruction.  The trial court gave the jury the following limiting instruction concerning the contents of each of the tape recorded exhibits:

There is evidence before you in statements in each of these exhibits that are made, either by Detective Brannan or Detective Hernandez, of things that have allegedly happened.  Statements of alleged facts during the course of the interview.

Any statements made during the tape by either of those people may be considered by you to assist you, if it does, in understanding the answers to the questions given by the Defendant, or to understand the context of the question, but cannot be considered by you as actual matters of fact or truth in the case . . . . For an example only, that someone might be at a baseball game.  That is a statement made.  That cannot be considered as a fact based upon coming from [the exhibit].  Does everyone understand, but can be used, if at all, if it assists you at all in understanding the question or the answers to the question?”

The jury is presumed to follow the trial court’s instructions in the manner presented. 
See Williams v. State
, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) (jury presumed to follow court’s instructions as given in charge).

Having reviewed each of the statements that Appellant complains of, we hold that the trial court did not abuse its discretion in admitting the statements because they were not offered to prove the truth of the matter asserted.  The statements were questions that Detective Brannan asked Appellant, and they were admitted in order to give context to Appellant’s replies.  As Appellant acknowledged, it would have been difficult to redact the entirety of Detective Brannan’s statements from the tape recorded statements and have Appellant’s statements still make sense to the jury.  Additionally, the trial court gave an instruction that was more favorable than Appellant’s requested instruction.  Accordingly, we overrule Appellant’s fifth and sixth points.  

In his seventh point, Appellant complains that the trial court erred by excluding Appellant’s proffered testimony regarding his then existing state of mind under rule of evidence 803(3).  Appellant sought on cross-examination to ask Montrel about a conversation that Montrel overheard between Appellant and an unidentified caller.  Montrel only heard Appellant’s side of the conversation.  Outside of the jury’s presence, Montrel testified that “the phone rang, and they started talking about—[Appellant] started talking, can he keep the car a little longer.”  Montrel could not specify what else was said during the conversation.  Appellant argued to the trial court that the statement was an exception to the prohibition against hearsay that reflected Appellant’s then existing mental condition because it showed that he was seeking authorization to keep the car.  The State objected on the basis of hearsay and speculation.

This statement is hearsay because it was offered to prove the truth of the matter asserted—that Appellant was asking someone else if he could keep the 

Griswolds’ car a little longer.  
See 
Tex. R. Evid.
 801(d).  Rule of evidence 803(3) provides an exception to the prohibition against hearsay for

[a] statement of the declarant’s then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s will.

Tex. R. Evid.
 803(3).  The State contends that the statement was one of “memory or belief to prove the fact remembered or believed” because the statement would establish that he borrowed the car from someone in the past.  Appellant urges that he offered the evidence to show that he did not know that the real owner of the car was dead.

In arguing that the statement is admissible under rule of evidence 803(3), Appellant cites 
United States v. DiMaria
, 727 F.2d 265, 270-72 (2nd Cir. 1984).  In 
DiMaria
, the appellant had stated, “I only came here to get some cigarettes real cheap.”  
Id.
 at 270.  The court analyzed the statement under the federal rules of evidence and determined that it was admissible, noting that the statement “was a statement about what [DiMaria] was thinking in the present.”  The statement in 
DiMaria
 is clearly an assertion of the appellant’s then existing mental state, unlike the statement in question here.  
See id.
  Standing alone, as it was presented, the statement does not clearly indicate Appellant’s state of mind at the time he made the statement.  

Here, whether the statement is reflective of Appellant’s then existing mental state showing that he did not know that the true owners of the car were dead is an area where reasonable minds may differ.  In such a situation, the trial court’s determination of admissibility must prevail.  
See Montgomery
, 810 S.W.2d at 391.  Accordingly, we cannot say that the trial court abused its discretion in refusing to admit this statement.  We overrule Appellant’s seventh point. 

INEFFECTIVE ASSISTANCE OF COUNSEL

In his second point, Appellant contends that he was denied effective assistance of counsel at trial in violation of the federal and state constitutions because counsel failed to immediately ask the trial court to appoint a death-qualified lead attorney.  In his fourth point, he asserts that he was denied effective assistance of counsel because his trial counsel failed to object to the admissibility of his third statement to police on the basis that it was given after only one attorney had been appointed for him, but he was also entitled to a second, death-qualified attorney.

1. Standard Of Review
 

To establish ineffective assistance of counsel, the appellant must show by a preponderance of the evidence that his counsel’s representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel’s deficiency, the result of the trial would have been different.  
Strickland v. Washington
, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); 
Salinas v. State
, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); 
Mallett v. State
, 65 S.W.3d 59, 62-63 (Tex. Crim. App. 2001); 
Thompson
 
v. State
, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). 

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case.  
Thompson
, 9 S.W.3d at 813.  The issue is whether counsel’s assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.  
See Strickland
, 466 U.S. at 688-89, 104 S. Ct. at 2065.  Review of counsel’s representation is highly deferential, and the reviewing court indulges a strong presumption that counsel’s conduct fell within a wide range of reasonable representation.  
Salinas
, 163 S.W.3d at 740; 
Mallett
, 65 S.W.3d at 63.  A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim.  
Thompson
, 9 S.W.3d at 813-14.  “In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel’s actions.”  
Salinas
, 163 S.W.3d at 740 (quoting 
Mallett
, 65 S.W.3d at 63).  To overcome the presumption of reasonable professional assistance, “any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.”  
Salinas
, 163 S.W.3d at 740 (quoting 
Thompson
, 9 S.W.3d at 813).

The second prong of 
Strickland
 requires a showing that counsel’s errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable.  
Strickland, 
466 U.S. at 687, 104 S. Ct. at 2064.  In other words, the appellant must show there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.  
Id.
 at 694, 104 S. Ct. at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  
Id.
  The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.  
Id.
 at 697, 104 S. Ct. at 2070.

2.  Failure To Request A Second, Death-Qualified Attorney

Appellant contends that the failure to unequivocally ask the trial court to appoint a second, death-qualified attorney under code of criminal procedure article 26.052(e) is an error for which no explanation of trial strategy is necessary.  Appellant refers us to 
Bone v. State
, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002), and 
Vasquez v. State
, 830 S.W.2d 948 (Tex. Crim. App. 1992), to illustrate the difference between errors that require that trial counsel be given an opportunity to explain and errors that do not require an explanation of counsel’s trial strategy.  In 
Bone
, the court of criminal appeals determined that the complained-of errors, which included failing to offer additional evidence during the punishment phase of trial, offering damaging or prejudicial evidence, and making certain statements during closing arguments, were all actions that trial counsel should have been given the opportunity to explain.  77 S.W.3d at 834-37.  In 
Vasquez
, the court of criminal appeals determined that the failure to seek an instruction on necessity would not have been an acceptable trial strategy under the facts of the case and the failure to request the instruction sufficiently undermined the court’s confidence in the conviction; thus, the court reversed the appellant’s conviction on direct appeal.  830 S.W.2d at 949-51. 

Trial counsel’s alleged deficiency in failing to request a second, death-qualified attorney is not the type of deficiency that no explanation of trial strategy would be needed.  In light of the prosecutor’s verbal assurances that the death penalty would be waived, trial counsel could arguably have a strategic reason for not demanding that the case be treated as a death penalty case.  Counsel, by appearing to rely on the prosecutors’ assurances, arguably could have thought that it would make it more difficult for the State to later abandon its initial position that the death penalty should be waived.   

The record does not reflect trial counsel’s reasoning for failing to immediately request a second, death-qualified attorney.  In the absence of counsel’s reasoning, the record is undeveloped and cannot adequately reflect the motives behind trial counsel’s actions.  
See Salinas
, 163 S.W.3d at 740.  Here, the allegation of ineffectiveness is not so firmly rooted in the record as to overcome the presumption that trial counsel’s conduct falls within the wide range of professional competence.  
See id
.  Accordingly, we overrule Appellant’s second point. 

2.  Failure To Object

In his fourth point, Appellant contends that his trial counsel was ineffective because he failed to object to the admission of Appellant’s third statement to police on the grounds that at the time he made the statement, he had not been appointed a second attorney as required by code of criminal procedure article 26.052(e).  Appellant argues that there could be no conceivable trial strategy for not invoking article 26.052(e) in the context of attacking the statement; however, Appellant has not argued that but for counsel’s alleged failure, the outcome of the proceeding would have been different.

Appellant’s third statement was not so significant that, but for its admission, the outcome of the proceedings would be different.  Appellant’s first two statements demonstrate his willingness to mislead the authorities, and his  second statement even places him at the scene of the crime at the time it was committed.  In light of the overwhelming evidence against him, Appellant has failed to prove that there is a reasonable probability that, but for counsel’s alleged failure to object to the admission of his third statement, the outcome of the proceeding would have been different.  
See 
Strickland
, 466 U.S. at 694, 104 S. Ct. at 2068. 
 Accordingly, we overrule Appellant’s fourth point. 

CONCLUSION

Having overruled Appellant’s seven points, we affirm the trial court’s judgment.

DIXON W. HOLMAN

JUSTICE

PANEL B:  DAUPHINOT, HOLMAN, and GARDNER, JJ.

PUBLISH

DELIVERED:  July 13, 2006

FOOTNOTES
1: We discuss Appellant’s ineffective assistance of counsel complaints in the final section of this opinion. 

2: 
See Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).