

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00183-CR

JOHNNY CALVIN SCOTT                                                        APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

## FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1359184R

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Johnny Calvin Scott appeals his conviction and life sentence for capital murder in the death of his girlfriend Vanessa Murrell and of her unborn child. In three issues, Scott argues that he was entitled to a self-defense instruction; that the trial court improperly admitted hearsay statements made by

---

[1]See Tex. R. App. P. 47.4.

the homicide detectives during the police interrogation of Scott, which was video recorded; and that he was entitled to a limiting instruction on the admission of the video containing the complained-of statements.  We will affirm.

## II. BACKGROUND

A stranger stumbled upon Murrell's body, slumped against the base of a tree in a vacant lot with her neck slit.  At the time of her death, Murrell was approximately thirteen weeks pregnant, and her unborn child died in utero without Murrell alive to sustain him.

On the day Murrell's body was found, officers arrested Scott in an unrelated incident.  Officer Paul Garcia and other officers were canvasing neighborhood carwashes that attracted various criminal activity.  As the officers approached one carwash, Officer Garcia saw Scott cutting across an empty private lot behind the carwash.  Officer Garcia stopped Scott and asked to see a form of identification; Scott responded that he did not have one.  After Officer Garcia again requested to see some identification, Scott "took off running." Officer Garcia and other officers chased Scott, and they eventually found him hiding in an abandoned house.  Officer Garcia arrested Scott for trespassing on the private lot and for evading arrest.  Officers later discovered that Scott had violated his parole and was the subject of outstanding warrants.

Officer Frederick Myers transported Scott to the police station.  While in the parking lot at the station, Officer Myers allowed Scott to use Officer Myers's phone, and Scott called his sister.  Something Scott's sister said agitated Scott,

and he explained to Officer Myers that his sister had just accused him of killing his girlfriend. At that moment, Detective Kyle Sullivan, who was already investigating Murrell's death, arrived in the parking lot. After Officer Myers related to Detective Sullivan what he had overheard, Scott was taken to an interview room.

Detective Sullivan and Detective Jeremy Rhoden interviewed Scott. Scott acknowledged having had an argument with Murrell the day before, but he denied harming her. He said that after their argument, they parted ways and that he had not seen her since then. During the interview, Detective Rhoden noticed spots that looked like blood on Scott's jeans. Scott's jeans were submitted to the Fort Worth Police Department crime lab for testing, and a senior forensic scientist for that lab confirmed at trial that some of the blood spots contained both Scott's and Murrell's DNA. Scott's DNA was also found under Murrell's nails.

After the interview, Detective Rhoden contacted Donald Halliburton, the person with whom Scott and Murrell had been staying. Haliburton gave a statement, detailing the fight between Murrell and Scott. Haliburton said that after Murrell had left, he had overheard Scott saying that he was going to kill Murrell. Haliburton remembered that Scott then left the house and did not return until four or five the next morning. A friend of Haliburton's, who was at his house the day before the murder, testified that Scott said that he planned to hurt Murrell—to "cut her up."

After a week-long trial, the jury found Scott guilty of capital murder, and the trial court sentenced him to life imprisonment. Scott then perfected this appeal.

### III. OMISSION OF SELF-DEFENSE INSTRUCTION WAS HARMLESS

In the course of investigating Murrell's death, the detectives interviewed Scott a second time. That interview was also recorded; in addition to the evidence set forth above, the jury also viewed the video of the second interview. During the second interview, Scott claimed that Murrell had brandished a box cutter during the argument and that he had reacted by grabbing Murrell's arm that held the box cutter and by twisting it back against her, cutting her on the left side of her neck—the side that was, in fact, slit. Scott said that Murrell then fled and that although he initially followed her to see if she was okay, he remembered he was on probation and instead walked to Haliburton's house and went to sleep. Later in the interview, Scott abandoned his self-defense story and again insisted he had nothing to do with Murrell's death.

Detective Rhoden testified at trial that there was no evidence Murrell ran after her neck had been slit. Based on the way the blood flowed from Murrell's neck, Detective Rhoden concluded that her neck had been slit while she was lying down.

The evidence also revealed that in addition to having her neck slit, Murrell had also been strangled, as evidenced by the location, number, and pattern of petechiae, or small dot hemorrhages, on her upper neck and face. Dr. Susan Roe, the medical examiner who performed the autopsy on Murrell's body,

4

testified that someone had strangled Murrell using broad pressure, consistent with an arm, applied to the neck. Based on the nature of the petechiae, Dr. Roe understood that the pressure on Murrell's neck had been applied for a "fair amount of time" and not "just a moment." Dr. Roe also noted that the strangulation occurred while Murrell was alive; otherwise, the dot hemorrhages would have emerged in areas of lividity, the areas in which blood pools in a body lacking a heartbeat. That observation in combination with the fact that Murrell's heart was still pumping when her neck was slit, as evidenced by the amount of blood pumped from the cut, convinced Dr. Roe that the strangulation preceded the neck slitting. Dr. Roe further testified that the neck slitting would have caused death within thirty to forty seconds, which was too brief to create the petechiae observed on Murrell's body. Dr. Roe identified the cause of death to be the neck slitting with asphyxiation being "a contributing factor."

In his first issue, Scott argues that the trial court erred by denying his requested jury instruction on self-defense. Scott contends that his brief admission—that he had slit Murrell's neck as he had attempted to restrain her arm after she had pulled out a box cutter and began slashing at him—is some evidence to support including a self-defense instruction in the jury charge.

## A. Standard of Review

A trial court must give a requested instruction on every defensive issue raised by the evidence without regard to its source or strength, even if the evidence is contradicted or not credible. *Krajcovic v. State*, 393 S.W.3d 282, 286

5

(Tex. Crim. App. 2013). A defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true. *Id.*

Our review of a purported jury-charge error is a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). We first determine whether error occurred; if error did not occur, our analysis ends. *Id.* If error occurred, whether it was preserved determines the degree of harm required for reversal. *Id.* If there was a timely objection, as in this case, the existence of jury-charge error will be reversed if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. *See* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006); *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). In other words, a properly preserved error will require reversal unless the error is harmless. *Almanza*, 686 S.W.2d at 171. This analysis requires us to consider (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see Almanza*, 686 S.W.2d at 171.

## B. Analysis

Assuming that Scott's quickly-abandoned assertion that Murrell had attacked him with a box cutter warranted a self-defense instruction and assuming that the trial court erred by failing to give such an instruction, we analyze whether Scott suffered some harm from the omission of a self-defense instruction in the charge. Looking first to the jury charge as a whole and defense counsel's closing argument, both reflect that the defense's strategy was to characterize Scott's self-defense statements during his second police interview as involuntarily made. Before trial, Scott moved to suppress the statements recorded in the second interrogation on the ground that they were involuntarily made. One of the two witnesses for the defense, Antoinette McGarrahan, a psychologist, extensively testified for the "sole purpose," as expressed by defense counsel in closing argument, of showing that Scott's limited cognitive abilities precluded a knowing and voluntary waiver of his *Miranda* rights. The other defense witness testified that Scott had been with her the night Murrell was killed. The jury charge instructed that Scott's interrogation statements could not be considered unless they were knowingly, intelligently, and voluntarily given.[2] And in closing argument, defense counsel argued extensively that the jury should disregard Scott's statement that he had forced Murrell's hand back so that the box-cutter cut her neck, insisting that Scott had uttered this statement involuntarily because

---

[2]*See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 1628 (1966).

7

he lacked the intelligence to understand the *Miranda* warnings he had received and because the interrogating detectives pressured him. Thus, reviewing the jury charge and the arguments of counsel in our harm analysis, this is not a case in which the jury was "without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013) (explaining harm generally associated with a denied self-defense instruction); *see, e.g.*, *Beckstrand v. State*, No. 02-12-00480-CR, 2015 WL 1544077, at *10 (Tex. App.—Fort Worth Apr. 2, 2015, no pet. h.) (mem. op., not designated for publication) ("Because Appellant admitted striking Noah, without the self-defense instruction, Appellant admitted the offense."). Instead, this is a case in which trial counsel's request for a self-defense instruction "appears to be an afterthought and does not appear to be the primary focus of his defensive theory at trial." *Cornet*, 417 S.W.3d at 455. In fact, even had the jury been instructed on self-defense, the defense itself had already discredited Scott's self-defense story as involuntarily made and had secured an instruction telling the jury to disregard all involuntary statements.

Looking at the entirety of the evidence, Scott's self-defense story was undermined throughout the trial. The jury heard Scott abandon his self-defense story almost immediately after telling it in the second interview. The other defense witness—besides the psychologist—testified that Scott had been with Murrell on the night she was killed, and other evidence demonstrated that a few hours before Murrell was killed, Scott angrily told her that he was going to kill her

8

and told others that he was going to "cut her up." There was no evidence of a struggle, and there was no evidence that Murrell ran after having her neck slit. Additionally, Scott's self-defense story did not fully explain Murrell's injuries, particularly the strangulation. Although the evidence demonstrated that Murrell had been strangled for what Dr. Roe said was a "fair amount of time" before having her neck slit, Scott did not mention strangulation in his self-defense story.

Furthermore, in assessing other relevant factors in the record, we note that the indictment and jury charge premised the capital murder charge on either slitting or strangulation, so even had the jury been instructed on self-defense, it would have been unable to conclude that Scott strangled Murrell in self-defense.

Having performed the harmless-error analysis mandated by *Reeves, Wooten,* and *Almanza*, we conclude that any harm in denying Scott's request for a self-defense instruction was harmless. *See Reeves*, 420 S.W.3d at 816; *Almanza*, 686 S.W.2d at 171. We overrule Scott's first issue.

### IV. DETECTIVES' STATEMENTS DURING INTERROGATION DO NOT CONSTITUTE HEARSAY

In his second issue, Scott argues that the trial court abused its discretion by refusing to suppress the unsworn statements that the detectives made during the video-recorded interview of Scott. Scott contends that the unsworn statements made by the detectives while they interviewed him constitute hearsay.

9

We review the trial court's admission of the video of the interview containing the complained-of statements under an abuse-of-discretion standard. *See Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Kirk v. State*, 199 S.W.3d 467, 478 (Tex. App.—Fort Worth 2006, pet. ref'd). We will uphold the admission so long as it falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542; *Kirk*, 199 S.W.3d at 478.

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Statements by interrogating officers that seek to elicit or gauge a defendant's response and are admitted as part of the recorded interrogation generally are not offered to prove the truth of the matter asserted. *See Kirk*, 199 S.W.3d at 478–79; *see also Wood v. State*, No. 01-13-00845-CR, 2014 WL 5780273, at *5 (Tex. App.—Houston [1st Dist.] Nov. 6, 2014, pet. ref'd) (mem. op., not designated for publication); *Fincher v. State*, No. 04-12-00489-CR, 2013 WL 5429928, at *2 (Tex. App.—San Antonio, Sep. 25, 2013, pet. ref'd) (mem. op., not designated for publication); *Humphrey v. State*, No. 01-08-00820-CR, 2012 WL 4739925, at *2 (Tex. App.—Houston [1st Dist.] Oct. 4, 2012, no pet.) (mem. op., not designated for publication). The relevance of statements by interrogating officers hinges on the defendant's response rather than on the statements' content. *See Kirk*, 199 S.W.3d at 478–79; *see also Wood*, 2014 WL 5780273, at *5; *Fincher*, 2013 WL 5429928, at *2. *Humphrey*, 2012 WL 4739925,

10

at *2.  This is true even if the statements, like the ones challenged by Scott, accuse the defendant of lying, express suspicion that the defendant was involved, or misrepresent the evidence.  *See Kirk*, 199 S.W.3d at 478–79; *Wood*, 2014 WL 5780273, at *5; *Fincher*, 2013 WL 5429928, at *2; *Humphrey*, 2012 WL 4739925, at *2.

Consistent with the general rule, the statements at issue in this case were not admitted for their truth.  For example, the detective's statement—"God blessed me with catching the killer of Vanessa Murrell"—was not offered to prove its theological content but as part of the context of Scott's interview.  Nor were the detectives' statements expressing suspicion that Scott was involved in Murrell's death admitted to prove that the officers were, in fact, suspicious.  The statements invited Scott to respond and allowed the officers to assess his honesty.  Additionally, when the State questioned Detective Rhoden, it targeted Scott's changing demeanor in his responses—he replied with more hesitance and gave more disjointed responses—once he had abandoned the self-defense story.  Moreover, the detective's inaccurate statement implying that only Scott's DNA was under Murrell's fingernails was designed to challenge Scott's version of the events, and the jury even heard Detective Rhoden acknowledge during cross-examination that the statement was inaccurate.

Because the complained-of statements are not hearsay, we hold that the trial court did not abuse its discretion by denying Scott's request to suppress them.  *See Kirk*, 199 S.W.3d at 478–79; *see also Wood*, 2014 WL 5780273, at

11

*5; *Fincher*, 2013 WL 5429928, at *2; *Humphrey*, 2012 WL 4739925, at *2.  We overrule Scott's second issue.

### V.  LIMITING INSTRUCTION NOT TIMELY REQUESTED

In his third issue, Scott argues that the trial court should have included in the jury charge his requested limiting instruction telling the jury to consider only his responses to the detectives' statements during the recorded interrogations.

The Texas Court of Criminal Appeals has explained that a limiting instruction should first be requested "when the evidence is admitted and then again at the final jury charge."  *Hammock v. State*, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001).  This is because "it is impossible for the jury to go back at the close of the trial and reassess the evidence in light of the limiting instruction, even if they could appreciate which items of evidence the instruction was supposed to apply to."  *Id.* (citation omitted).  When the evidence in question is admitted for all purposes, a limiting instruction on the evidence is not "within the law applicable to the case," and the trial court is not required to include the limiting instruction in the jury charge.  *Id.*

Here, the record reveals that Scott did not request the limiting instruction when the trial court admitted and published the video; instead, Scott requested the limiting instruction at the jury-charge conference after the close of evidence. The video that included the detectives' statements was therefore admitted for all purposes, and thus the trial court was not required to include the limiting instruction in the jury charge.  *See id.*  We therefore hold that the trial court did

not err by refusing to include Scott's untimely-requested limiting instruction in the jury charge. *See id.*; *see also Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007) ("[I]f a defendant does not request a limiting instruction . . . at the time that the evidence is admitted, then the trial judge has no obligation to limit the use of that evidence later in the jury charge."); *Freeman v. State*, 413 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (holding same); *Taylor v. State*, No. 02-11-00092-CR, 2012 WL 955383, at *7 (Tex. App.—Fort Worth Mar. 22, 2012, no pet.) (mem. op., not designated for publication) (same). We overrule Scott's third issue.

## VI. CONCLUSION

Having overruled Scott's three issues, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and SUDDERTH, JJ.

SUDDERTH, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 4, 2015

13