COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-456-CR

ALFREDO LEYVA PECINA APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

In four issues, appellant Alfredo Leyva Pecina appeals his conviction for the murder of his wife.  We affirm.

BACKGROUND

Appellant and his wife, Michelle Arias, lived with her father and her sister, Gabriela Arias, in an apartment in Arlington.  Gabriela found Michelle’s body when she returned to the apartment after work.  Michelle had been stabbed and cut around fifty-five times.  Appellant, bleeding from stab wounds, was present when Gabriela found Michelle’s body.  Michelle died at the scene.

Gabriela testified that she left work around eight o’clock that night to meet her sister at the apartment for a concert they planned to attend that night. She found Michelle lying on the floor of the bedroom Michelle and Appellant shared.  She looked for the phone to call 911 and then saw Appellant, covered with a blanket, next to Michelle.  She testified that he stood up, looked angry, and came towards her in a manner that made her think he was going to attack her. She threw the phone at him and ran to a neighbor’s apartment.  The neighbor, Luis Cardoso, also testified at trial.  He called 911 and accompanied Gabriela back to the apartment.  A recording of the 911 call that Cardoso made was played for the jury.

Cardoso testified that Appellant was resting face down halfway between the bedroom and the hallway.  Cardoso testified that he saw Appellant open his eyes when he walked past and that he believed Appellant was a threat, so he went back to his apartment for help and brought back two of his brothers-in-law and his oldest son.  Other testimony at trial indicated that Appellant and his wife had been having marital problems.

The trial court denied Appellant’s motion to suppress his oral and written statements to the police and read his findings of fact and conclusions of law into the record.  In the taped confession to the police, Appellant stated that he did not remember much that happened that day, but that he had not used drugs or alcohol and that he and Michelle had fought because she was going out that night without him.  They argued about her not wanting to be with him.  When asked if he had cut Michelle, Appellant said, “[Y]es,” and explained that they had been struggling.  The English translation of the interview was read to the jury at trial.

The English translation of Appellant’s written statement, taken down in Spanish by one of the detectives and signed by Appellant, was also read to the jury:

This past Friday I was arguing with my wife, Michelle.  She was to go out, but she did not want me to go.  Also[,] she said to me that she did not want to be with me.  I became angry, and we began to fight.  She also told me that I did not have papers.  Also, she said to me that here is not like in Mexico.  I was not thinking things through . . . It was over, and I did not leave.  I stayed in the apartment.  I picked up the knife from the kitchen.  I do not remember how many times I cut Michelle, but I know there were many times.  I thought that Michelle was alive.  Also, I do not remember cutting myself.  Also, I did not see Gabby.  This evening, I did not use drugs or alcohol.  I asked for a lawyer, but I also wanted to talk with the Arlington police.

Todd Roper, one of the firefighter paramedics who responded to the 911 call, described the scene in the apartment bedroom as 

extremely bloody.  There was blood six, seven foot high around the walls[,] on most of the furniture, a large amount around both victims that we saw at that point.  Both the man in the doorway and the young lady across the room, both had large amounts of blood around them.

Photographs of the scene were admitted into evidence.  Appellant’s attorney objected to the photographs depicted in State’s exhibits 9-28, arguing that they were unduly cumulative and that their prejudicial effect outweighed their probative value.  
See 
Tex. R. Evid. 
403.  The trial judge overruled these objections, and the State published these photographs to the jury.

At trial, evidence was introduced that DNA from a third person was collected from the mirror in the area connecting the bedroom and bathroom, and that an unknown person’s fingerprint was found on the knife.  Pete Salicco, a latent print examiner with the Arlington Police Department, testified that he compared the fingerprint on the knife to Appellant, Michelle, and Gabriela, and that he was not able to make a match.  The knife was not tested for DNA.  However, there was no shortage of potential DNA or fingerprint donors.  Roper described approaching the apartment as hectic, with lots of people milling around outside, and inside the apartment, “a number of people in various states of what I would say, hysteria, just generally upset.”  He testified that he and another firefighter went into the bedroom and checked Michelle’s and Appellant’s injuries.  Cardoso brought his son and two brothers-in-law back to the apartment, and testified that his son might have gone in the bedroom but that he did not know if his son had touched anything.  Cardoso added that he might have touched the walls, but not anywhere there was any blood, and that he did go into the bedroom, but did not touch anything.

Officer Harris, who secured the knife, testified that she was aware that the knife had been moved before she arrived.  Detective Nutt testified that many people might have handled the knife prior to the arrival of the police and that the crime scene was unsecure for several minutes.

MOTION TO SUPPRESS

In his first and fourth issues, Appellant complains that the trial court erred by overruling his motion to suppress his confession because the statement was obtained in violation of his right to counsel and because the police failed to notify the Mexican consulate of Appellant’s arrest and detention, in violation of the Vienna Convention.
(footnote: 2)
Standard Of Review

We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard of review.  
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court’s decision, we do not engage in our own factual review.  
Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State
, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); 
State v. Ballard
, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).  Therefore, we give almost total deference to the trial court’s rulings on (1) questions of historical fact, even if the trial court’s determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.  
Montanez v. State
, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006); 
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); 
State v. Ballman
, 157 S.W.3d 65, 68 (Tex. App.—Fort Worth 2004, pet. ref’d).  But when the trial court’s rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court’s rulings on mixed questions of law and fact.  
Estrada v. State
, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); 
Johnson
, 68 S.W.3d at 652-53.

Stated another way, when reviewing the trial court’s ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court’s ruling.  
State v. Kelly
, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court’s ruling, supports those fact findings.  
Id
. at 818-19.  We then review the trial court’s legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling.  
Id
. at 819.  We must uphold the trial court’s ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling.  
Armendariz v. State
, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), 
cert. denied
, 541 U.S. 974 (2004); 
Ross
, 32 S.W.3d at 856; 
Romero
, 800 S.W.2d at 543.

Suppression Hearing
 
Findings

The trial judge made the following oral findings of fact and conclusions of law
(footnote: 3) at the conclusion of the suppression hearing:

[Appellant] had been read his rights by Judge Maddock at the . . . [h]ospital, . . . he was informed of his rights to have a lawyer, to hire a lawyer, to have one appointed to him, that if he could not afford one, one would be appointed, that he had a right to remain silent, that he did not have to speak to the police, that he’s not required to make a statement, and any statement that he made could be held against him in a court of law.

He had a right to stop the interview or questioning at any time, that he had a right to have an examiner at the trial if he wishes to have one, and that he was also subject to deportation if he was not a U.S. citizen, that this was translated to [Appellant] in Spanish by Judge Maddock, who was fluent in Spanish, being a  . . . Cuban national, that likewise, [Appellant] indicated that although he did want a lawyer, that he wished to also talk with detectives from Arlington, meaning that he basically was waiving his rights at that time when he requested to have the detective speak to him, that the detectives likewise talked with him, Detective Nutt and Detective Frias, . . . who was a Spanish speaker and interpreted everything concerning his rights.

And once again, he was given his rights again, wherein he decided that he would talk with the detectives concerning the incident that was involved in the death of his wife, Michelle Arias.

That he did, in fact, sign various waivers of counsel, did not seem that he was under the influence of any intoxicants, be it drugs or alcohol, that he, in fact, gave a statement that was recorded as well as placed in writing, and that as such he was also, upon being placed in the Tarrant County Jail, given a document stating whether or not he wished to discuss anything with the Mexican Consulate.  He at that time stated that he did not.

And based upon all of the above, the Court’s going to make a finding that the statement was taken voluntarily, and as such it’s going to be admissible.

Arlington municipal court judge Rosalia Maddock, Detectives Nutt and Frias, and Appellant testified at the suppression hearing.
(footnote: 4)
Vienna Convention

On arrest, authorities must notify a foreign national that he has a right to contact his consulate.  
See
 Vienna Convention on Consular Relations, art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 100-101, 
available at
 
http://untreaty.un.org/ilc/texts/instruments/english/conventions/9_2_1963.pdf.  However, because the court of criminal appeals has held that suppression is not an appropriate remedy for violations of the Vienna Convention, we overrule Appellant’s fourth issue.  
Sierra v. State
, No. PD-453-05, 2007 WL 840483, at *3 (Tex. Crim. App. Mar. 21, 2007); 
see also Sanchez-Llamas v. Oregon
, 126 S. Ct. 2669, 2674, 2681-82 (2006) (stating that Vienna convention and

federal exclusionary rule precedent did not support suppression as an appropriate remedy for article 36 violations because foreign nationals detained in the U.S. already enjoy due process and Fifth and Sixth Amendment protections).

Right To Counsel

A statement of an accused may be used in evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion.  
See
 
Tex. Code Crim. Proc. Ann
. art. 38.21 (Vernon 2005).  A written statement made by the accused is not admissible unless he received  the proper warnings from a magistrate and, prior to making the statement, knowingly, intelligently, and voluntarily waived those rights.  
Id.
 
art. 38.22, § 2.  The same warnings are required for an oral statement.  
Id
. § 3(a)(2). Because Appellant argues that his right to counsel was violated and refers us to both Fifth and Sixth Amendment cases, and because the trial judge stated only that Appellant waived his rights, we will address his right to counsel under both the Fifth and Sixth Amendments.
(footnote: 5)  
See
 
U.S. Const
. amends. V, VI; 
Miranda v. Arizona
, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612 (1966).

Fifth Amendment Right To Counsel (
Miranda
)

In 
certain pretrial settings, the Fifth Amendment privilege against compulsory self-incrimination requires that if a custodial interrogation continues without the presence of an attorney and results in a statement being taken, the State has the burden to show that the defendant knowingly and intelligently waived his right to counsel.  
Miranda
, 384 U.S. at 475, 86 S. Ct. at 1628.  Such a waiver must be proven by a preponderance of the evidence.  
Colorado v. Connally
, 479 U.S. 157, 168, 107 S. Ct. 515, 522 (1986).  If the State shows that a suspect’s decision not to rely on his 
Miranda
 rights was uncoerced, that he at all times knew he could stand mute and consult a lawyer, and that he was aware the State could use his statements against him, the State’s burden of proof is met and waiver is shown as a matter of law.  
Moran v. Burbine
, 475 U.S. 412, 422-423, 106 S. Ct. 1135, 1141 (1986); 
see also Robinson v. State
, 851 S.W.2d 216, 223 (Tex. Crim. App. 1991), 
cert. denied
, 512 U.S. 1246 (1994).

If a suspect in custody has clearly asserted his right to counsel, interrogation must cease and may begin again only if “counsel has been made available . . . [or] the accused himself initiates further communication, exchanges, or conversations with the police.”  
Edwards v. Arizona
, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981); 
see Cross v. State
, 144 S.W.3d 521, 526-27 (Tex. Crim. App. 2004).  However, unlike the right to counsel under the Sixth Amendment, which attaches automatically, the Fifth Amendment right to counsel will attach only when affirmatively invoked by the accused.  
See Davis v. United States
, 512 U.S. 452, 456-57, 459, 114 S. Ct. 2350, 2354-55 (1994)
.  Such an invocation must be clear and unambiguous.  
Dinkins v. State
, 894 S.W.2d 330, 351-52 (Tex. Crim. App. 1995), 
cert. denied
, 516 U.S. 832 (1995).  The right to counsel is considered invoked when the accused indicates that he wants to speak to an attorney or have an attorney present during questioning.  
Lucas v. State
, 791 S.W.2d 35, 45 (Tex. Crim. App. 1989), 
cert. dism’d
, 524 U.S. 965 (1998). 
 
The Fifth Amendment bars only compulsory self-incrimination; it does not bar unwise confessions. 
Holloway v. State
, 780 S.W.2d 787, 792 (Tex. Crim. App. 1989).

Judge Maddock testified that she introduced herself to Appellant, told him that the two officers wanted to talk with him, and then read him his rights in Spanish.
(footnote: 6)  These rights included the following specific language:

(2) You have a right to hire a lawyer and have him/her present prior to and during any interview and questioning by peace officers or attorneys representing the [S]tate;

(3) If you cannot afford a lawyer, you have the right to request the appointment of a lawyer to be present prior to and during any such interview and you have the right to have an attorney appointed to represent you if you cannot afford an attorney.  This means you may obtain your own lawyer or have a lawyer appointed for you.  You may have reasonable time and opportunity to consult your lawyer if you desire.  In the event you want an attorney appointed for you, you will be asked to complete a written form that contains questions about your financial resources.  You will be provided with the forms needed to make a request for an attorney.  If you need help completing the forms, assistance will be provided for you;

(4) You have the right to remain silent.  You do not have to speak to the police;

(5) You are not required to make a statement, and any statement you make can and may be used against you in court;

(6) You have the right to stop any interviewing or questioning at any time.  If you decide to answer questions, you may stop the questioning at any time[.]

Judge Maddock testified that after she had Appellant sign the warnings, she asked him if he wanted a court-appointed attorney, and he indicated that he did.  She then asked him if he still wanted to speak to the detectives, and he said, “[Y]es.” She testified that his decision to speak with the detectives appeared to be free, intelligent, knowing, and voluntary, that there had been no coercion, and that it appeared to her that he wanted a court-appointed attorney for the court proceedings.
(footnote: 7)
 Detective Nutt testified that he and Detective Frias left Judge Maddock to arraign Appellant after introducing themselves and re-entered the room after Judge Maddock informed them that Appellant had requested an attorney and to speak with them.  He also testified that prior to taking Appellant’s statement, Appellant did not appear to be under the influence of any drugs or medication and that he checked with the nurse, who informed him that Appellant had not been on any type of pain medication in the previous twenty-four hours. Detective Nutt said that Detective Frias explained to Appellant in Spanish who they were and why they were there, and “at that point in time he did say he wanted to talk to us, and we advised him that we were going to record the interview.”  He further testified that Detective Frias asked Appellant to sign the waiver of counsel form prior to giving the interview, which Appellant did. Detective Frias noted on the form, in Spanish, “I asked for a lawyer but also I wanted to speak with the Arlington police.”

They read Appellant his rights in Spanish twice—once before starting to record the interview, and again after noticing that the recording device failed to tape the first time.  Detective Nutt testified that Detective Frias read Appellant his 
Miranda
 rights in Spanish on the recording and had Appellant review and sign the bottom of the standard 
Miranda
 Spanish language warnings card.  He testified that at no time did Appellant ask to stop the interview or ask to visit with counsel first, that it appeared to him that Appellant was making a knowing, intelligent, and voluntary waiver of his rights when he agreed to speak to them, that Appellant’s demeanor was cooperative, and that he did not threaten Appellant or make any promises in return for his cooperation.

Detective Frias testified that Appellant knowingly, intelligently, and voluntarily waived his rights, without any coercion, and agreed to speak with them.  He also testified that at no time during the interview did Appellant request to terminate the interview or ask for an attorney.
(footnote: 8)
 Appellant’s testimony at the suppression hearing focused solely on the consular issue, stating that he was a Mexican citizen, and that if he had been informed of his rights under the Vienna Convention, he “would have waited to first speak with the Mexican Consulate.”  When asked what he would have done if the consulate had advised him to obtain an attorney, he indicated that he would have done as they advised.  And then he agreed that if an attorney had advised him not to talk to the police, he would not have talked with them.
(footnote: 9) 

The trial judge had the discretion, based on Judge Maddock’s testimony, to conclude that Appellant was aware, after she read his rights to him, that he could remain silent, consult a lawyer, and that the State could use his statements against him.  
See Moran
, 475 U.S. at 422-23, 106 S. Ct. at 1141.  After receiving those warnings, he still indicated that he wanted to speak with the detectives, who Mirandized him twice during the questioning.  The detectives testified that Appellant did not request the assistance of counsel during the interview nor ask to end the interview.  In his testimony at the suppression hearing, Appellant speculated, in hindsight, what he would have done differently with regard to the advice of counsel.

On these facts, we conclude that the trial court had the discretion to find that Appellant waived his right to counsel: either by failing to invoke it, because nothing in the testimony at the hearing or at trial clearly showed that Appellant indicated to Judge Maddock or the detectives at the time of the interview that he wanted to speak to an attorney about the questioning or to have one present during questioning, or because he reinitiated the contact by answering, “[Y]es,” when asked by Judge Maddock if he still wanted to speak with the detectives and by telling the detectives that he wanted to talk to them. 
 See Edwards
, 451 U.S. at 484-85, 101 S. Ct. at 1884-85; 
Lucas
, 791 S.W.2d at 46.

Sixth Amendment Right To Counsel

The Sixth Amendment to the U.S. Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense.”  
U.S. Const
. amend. VI.  This right to counsel attaches at the formal initiation of adversary judicial proceedings “whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.”  
Brewer v. Williams
, 430 U.S. 387, 398, 97 S. Ct. 1232, 1239 (1977); 
see also Robinson v. State
, 851 S.W.2d 216, 224 (Tex. Crim. App. 1991), 
cert. denied
., 512 U.S. 1246 (1994).  A defendant, taken before a magistrate for an article 15.17 hearing after formal charges have been filed, can invoke his Sixth Amendment right to counsel by seeking appointment of counsel.  
Kirk v. State
, 199 S.W.3d 467, 477 (Tex. App.—Fort Worth 2006, pet. ref’d); 
see also Hargrove v. State
, 162 S.W.3d 313, 321 (Tex. App.—Fort Worth 2005, pet. ref’d) (indicating that the adversarial process had begun when the defendant was taken before a magistrate for his article 15.17 hearing after an arrest warrant had been issued).

At the suppression hearing, Detective Nutt testified that he brought Judge Maddock to the hospital because he wanted to try to get Appellant arraigned before the detectives attempted to interview him.  After the hearing, during trial, he testified that after viewing the crime scene, he prepared an arrest warrant for Appellant.  Judge Maddock answered affirmatively at trial when asked whether the magistrate warnings were the warnings required under article 15.17 of the code of criminal procedure.  We conclude that formal adversarial proceedings had begun against Appellant when Judge Maddock arraigned him, such that his Sixth Amendment right to counsel had attached.  
See Brewer
, 430 U.S. at 398, 97 S. Ct. at 1239; 
Kirk
, 199 S.W.3d at 477; 
Hargrove
, 162 S.W.3d at 321.  After Judge Maddock gave him his warnings, Appellant’s request for a court-appointed attorney was sufficient to invoke his Sixth Amendment right to counsel.  
See Kirk
, 199 S.W.3d at 477; 
Hargrove
, 162 S.W.3d at 321.

An accused who has been admonished with 
Miranda
 warnings has been sufficiently apprised of the nature of his Sixth Amendment rights, so a waiver on that basis is considered a knowing and intelligent one.  
See Patterson v. Illinois
, 487 U.S. 285, 296, 300, 108 S. Ct. 2389, 2397-99 (1988).  If an accused does request the assistance of counsel after his Sixth Amendment right has attached, then the police may not initiate any questioning of him or attempt to induce him to waive his right to counsel unless counsel is first provided.  
Michigan v. Jackson
, 475 U.S. 625, 635-636, 106 S. Ct. 1404, 1410-1411 (1986) (extending the 
Edwards
 per se exclusionary rule to the Sixth Amendment context).  But when an unrepresented accused knowingly and intelligently makes the choice to “go it alone” in interrogation and initiates the conversation, his uncounseled statements are admissible.  
See Patterson
, 487 U.S. at 290 n.3, 291, 108 S. Ct. at 2393 n.3, 2394 (distinguishing between waiver when an accused already has an attorney and when he does not, and stating that waiver would be invalid if the accused already has an attorney because “[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect”); 
see also Holloway
, 780 S.W.2d at 795 (holding that when a relationship between the accused and his attorney is established after the Sixth Amendment right attaches, the Sixth Amendment precludes dissolution of that relationship in the absence of counsel and that only through notice to defense counsel may authorities initiate interrogation of an indicted and represented defendant).  Appellant’s trial attorney was appointed the day after Appellant’s meeting with the magistrate judge and the detectives.

We held in 
Kirk
 that the same two-step analysis that the court of criminal appeals recognized in 
Cross 
to show that an accused has waived his previously invoked right to counsel under the Fifth Amendment applied equally to waiver of that right under the Sixth Amendment.  
See Cross
, 144 S.W.3d at 526-27 (holding that State must show re-initiation and waiver after right to counsel is invoked); 
Kirk
, 199 S.W.3d at 476-77 (applying 
Cross
 analysis to Sixth Amendment). 
 As in 
Kirk
, the State here had to prove that Appellant reinitiated contact after he requested appointment of counsel at his article 15.17 hearing and that he then validly waived his right to counsel.  
See Kirk
, 199 S.W.3d at 476-77.

As discussed above, Judge Maddock testified that she asked Appellant if he wanted a court-appointed attorney and then asked him if he still wanted to speak with the detectives and that he said “yes” to both.  The detectives, who had been informed by Judge Maddock that Appellant had asked for an attorney and to speak with them, testified that Appellant told them that he wanted to talk with them.  Appellant’s statement, “I asked for a lawyer, but also I wanted to speak with the Arlington police,” confirms that Appellant invoked his right to counsel, and then re-initiated contact.  
See Kirk
, 199 S.W.3d at 478.  We must next determine whether after re-initiating contact, Appellant validly waived his Sixth Amendment right to counsel, as found by the trial court.

Appellant had been given his warnings under article 15.17 and his 
Miranda 
rights twice, in Spanish, before making his statement.  He initialed the  police card with the 
Miranda 
rights written in Spanish after reviewing them, and answered on the recording that he understood each right as it was read to him. Detective Frias testified that Appellant had not been deprived of food, drink, or sleep, nor coerced or threatened into participating in the interview.  Giving due deference to the trial court’s findings of fact and viewing the totality of the circumstances, we hold that the trial court did not abuse its discretion in finding that Appellant voluntarily waived his rights.  
See id. 
 Accordingly, we overrule Appellant’s first issue.

EVIDENCE

In his second and third issues, Appellant complains that the trial court erred in admitting certain gruesome photographs, and that there was insufficient evidence, as a matter of law, to convict him of his wife’s murder.

Admission Of Evidence
 

Appellant argues in his third issue that the trial court abused its discretion by admitting, over his objections, the “gruesome” photographs in State’s Exhibits 5 and 9-28, both individually and cumulatively, because their probative value was far outweighed by their unfair prejudicial effect, under rule 403.  
See
 
Tex. R. Evid. 
403.

Preservation Of Error

To preserve a complaint for appellate review, the record must reflect that the complaint was made to the trial court and either that the trial court ruled on it, expressly or implicitly, or that the appellant objected to its refusal to do so.  
Tex. R. Evid
. 103(a); 
Tex. R. App. P
. 33.1(a)(2); 
Gutierrez v. State
, 36 S.W.3d 509, 510-11 (Tex. Crim. App. 2001); 
Darty v. State
, 709 S.W.2d 652, 655 (Tex. Crim. App. 1986).  Appellant has failed to preserve his complaint with regard to Exhibit 5 because, after taking the sponsoring witness on voir dire, he stated that he “would have no objection to Exhibit 5.”  The trial court subsequently ruled that Exhibit 5 “will be admitted without objection,” and  then noted and overruled Appellant’s objections to Exhibits 9-28, admitting all of them into evidence.  We overrule Appellant’s third issue as it concerns Exhibit 5.

Standard Of Review

When determining whether photographic exhibits were properly admitted, the question is not whether the exhibits are more prejudicial than probative, but rather, whether the probative value of the photographs is 
substantially outweighed 
by the danger of unfair prejudice.  
Salazar v. State
, 38 S.W.3d 141, 151 (Tex. Crim. App.), 
cert. denied
, 534 U.S. 855 (2001); 
see also 
Tex. R. Evid. 
403.  We review a trial judge’s rule 403 decision for an abuse of discretion, meaning it will be reversed only if the decision is outside the zone of reasonable disagreement. 
 Salazar
, 38 S.W.3d at 151; 
Narvaiz v. State
, 840 S.W.2d 415, 428-29 (Tex. Crim. App. 1992), 
cert. denied
, 507 U.S. 975 (1993).

Photographic Evidence

Rule 403 requires an admissible photograph to possess “some probative value and that its probative value not be substantially outweighed by its inflammatory nature.”  
Santellan v. State
, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997).  We consider these general rule 403 factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent’s need for the evidence.  
Erazo v. State
, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).  And in the context of the admission of photographs, we also consider the following nonexclusive list: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case.  
Id
.; 
King v. State
, 189 S.W.3d 347, 355 (Tex. App.—Fort Worth 2006, no pet.).

Appellant does not allege any tampering or enhancement of the photographs in an attempt by the State to inflame, confuse, or mislead the jury.  Indeed, his primary argument is that the introduction of the photographic evidence “was completely unnecessary,” because the crime scene investigator testified that she could explain where blood samples were obtained from her diagram, Exhibit 29, without the bloody photographs.

While crime scene investigator Smith did testify that she could tell the jury where she collected various samples of blood by using a diagram, photographs 9-28 reveal much more than the mere location of blood sampling. Smith indicated that the photographs panned across the bedroom in progression, showing more parts of the crime scene in each photograph.  She described the crime scene as the north bedroom and an open bath area on the east side, consisting of a sink and a mirror.  She testified that when she entered the bedroom, she saw an initial pool of blood at the entrance to the bedroom, the victim lying face up, and blood stains all over the bedroom.

Smith testified that Exhibit 9 was “just a close-up of the victim.”  Exhibit 9 shows a close-up of the victim’s head and upper torso—her white shirt is drenched red with blood and there are dried blood spatters on her face and a pool of blood on the carpet near her neck.  Smith testified that Exhibit 10 was a view of the bedroom, close to the entry of the bedroom at the door.  Exhibit 10 shows the victim’s torso and lower body and the extent of blood stains on the carpeted floor.  Smith testified that Exhibit 11 showed the victim’s head in relation to the bedroom closet door and showed blood spatter on the walls which was consistent with the rest of the room.  She testified that Exhibit 12 was a head-on view of the closet door with a ruler showing the scale of the blood spatter on the closet door.  It also shows smears of blood on the wall. She testified that Exhibit 13 showed the north wall of the open bathroom area with the victim at the bottom of the photograph.  It also shows more blood stains on the carpet in that open bathroom area and blood spatters and smears on the wall in the open bathroom area.  Smith testified that Exhibit 14 showed more of the bathroom area and the floor.  It also shows the bloodstains on the open bathroom area carpet and blood spatters on the open bathroom area’s cabinet doors.  She testified that Exhibit 15 was “just a better view of the open bathroom area,” and shows the knife.  It also shows the spatter of blood on the top of the open bathroom area’s counter and on the mirror.

Smith testified that Exhibit 16 was a closeup of the front counter of the bathroom sink.  It also shows how blood dripped down the cabinets and spattered throughout the area and a small pool of blood on the carpet.  She testified that Exhibit 17 showed the overall view of the bathroom, including a better image of the mirror and the opposite wall of the bathroom, and a palm print on the mirror.  It also shows the knife clearly.  She testified that Exhibit 18 was a view of the north wall of the open bathroom with the ruler for scale. She testified that Exhibits 19-22 showed the top counter of the bathroom sink. They show different parts and angles of the top counter and the sink—there are drops of dried blood on the sink and the counter and everything on it.

Smith testified that Exhibit 23 showed a close-up of the sink and mirror, with a closer image of the palm print, that Exhibit 24 showed the south wall in the open bathroom area, and that Exhibits 25 and 26 were better images of the knife on the floor, taken at different angles.  She testified that Exhibit 27 was a closeup of the knife at the scene and Exhibit 28 was a photograph of the knife in the lab, including a ruler for scale.  Smith testified that the knife was approximately twelve inches in length, with a blade of seven to eight inches. Before Exhibits 9-28 were admitted, the trial court admitted Exhibits 6 and 7 during Cardoso’s testimony, over Appellant’s objections under rule 403. Exhibit 6 is a photograph of the crime scene from the hallway facing into the bedroom and Exhibit 7 is a closer view from a different angle.  Cardoso testified that the young lady in the photograph was the one he had described earlier in his testimony.  Exhibit 8 is similar to Exhibit 7, but taken from a different angle. The jury could have found Exhibits 9-28 highly probative with regard to the manner in which the murder occurred. 
 See Erazo
, 144 S.W.3d at 489. Smith’s terse descriptions of the photographs failed to capture the entirety of the brutal act and its wide-ranging scope throughout the bedroom and open bathroom area.  While these photographs had the potential to impress the jury in an irrational way because of their graphic nature, they were not as descriptively gruesome as Roper’s testimony, for example, that there was blood six or seven feet high on the walls.  
Id
.  The body was not naked, and the time taken to develop the evidence was minor in relation to its ability to put all of the testimony in context.  
Id
.  All of the photographic exhibits, 9-28, were in color, 18 inches x 20 inches, mounted on black cardstock.  Given the nature of the murder, they were not unduly gruesome, but did demonstrate the ruthlessness involved in killing the victim.
  

In 
Chamberlain
, the court of criminal appeals faced the same complaint from an appellant, about eight color photographs of a particularly brutal murder, in which the appellant had bound the victim with duct tape, sexually assaulted her, shot her in the forehead, and then left her semi-nude body on her bathroom floor.  
Chamberlain v. State
, 998 S.W.2d 230, 232, 236-37 (Tex. Crim. App. 1999), 
cert. denied
, 528 U.S. 1082 (2000).  The photographic exhibits included closeup shots of the victim’s face with brain matter extruding through the large wound on the side of the head, of torn skin around the bullet wound to the head, of the exit wound in the back of the head, and of the victim’s duct-taped hands.  
Id
. 
at 236-37.  The court responded by rejecting the premise that visual evidence accompanying oral testimony would be cumulative of the testimony or of insignificant probative value.  
Id.
 at 237.  The court stated,

Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions.  Nor do we agree with appellant’s assertion that the photographs are inflammatory.  The photographs are gruesome in that they depict disagreeable realities, but they depict nothing more than the reality of the brutal crime committed.  And it is precisely because they depict the reality of this offense that they are powerful visual evidence, probative of various aspects of the State’s case.

Id
.  Because the same reasoning applies to the case before us, we cannot say that the trial court abused its discretion by deciding that the photographs’ probative value here was not substantially outweighed by the danger of unfair prejudice.  We overrule Appellant’s third issue.

Legal Sufficiency Of The Evidence

In his second issue, Appellant argues that the trial court erred by denying his motion for a directed verdict and claims that there was insufficient evidence as a matter of law to convict him.
(footnote: 10)
Standard Of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  To commit a murder, the person must either intentionally or knowingly cause the death of an individual, or intend to cause serious bodily injury and commit an act clearly dangerous to human life that causes the death of an individual.  
Tex. Penal Code Ann
. § 19.02(b)(1), (2) (Vernon 2003).

The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 
Tex. Code Crim. Proc. Ann
. art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found that Appellant murdered his wife, based on his oral and written confessions, including his statement that no one else was in the apartment when he cut his wife, testimony by Gabriela about their marital problems and that the apartment did not look like anyone had broken in or that anything had been stolen, other witnesses’ testimonies about the night of the murder, and the evidence collected by the police, including the knife, Appellant’s palm print on the mirror, and the photographs of the scene. The jury reasonably could have chosen to believe Appellant’s confession and resolved the presence of a third person’s DNA and fingerprint through the various witness testimonies about the number of people who had been in the bedroom before the crime scene was secured by the police.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Margraves
, 34 S.W.3d at 919.

Thus, resolving any inconsistencies in the evidence in favor of the verdict, we hold that there was legally sufficient evidence for the jury to conclude that Appellant committed the murder and to convict him.  
See Curry
, 30 S.W.3d at 406; 
Dewberry
, 4 S.W.3d at 740.  We overrule Appellant’s second issue.

CONCLUSION

Having overruled all of Appellant’s issues, we affirm the trial court’s judgment.

DIXON W. HOLMAN

JUSTICE

PANEL B:  HOLMAN, GARDNER, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:
  May 3, 2007

FOOTNOTES
1:
See 
Tex. R. App. P
. 47.4.

2:
Arlington Police Detectives Richard Nutt and David Frias testified that they attempted to contact the consulate before interviewing Appellant.  Detective Nutt testified that he tried to leave a message that Appellant was being held and charged with murder.  Detective Frias testified that he received a phone call from the consulate five days after the interview.

3:
While neither party moved for written findings of fact and conclusions of law, and none were filed, it is apparent from the record that the trial court intended for its findings and conclusions to be expressed via its oral pronouncements.  In reviewing a motion to suppress, oral findings of fact can be considered as findings of fact on the record and given due deference.  
See, e.g., Flores v. State
, 177 S.W.3d 8, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d) 
(
reviewing trial court’s oral findings of fact on a motion to suppress), 
cert. denied
, 126 S. Ct. 2298 (2006).

4:
After the trial court denied Appellant’s suppression motion, Judge Maddock and Detectives Nutt and Frias presented essentially the same testimony to the jury.

5:
Appellant also raises article I, section 10 of the Texas Constitution as guaranteeing his right to counsel.  However, we will only address whether Appellant’s rights were violated under the U.S. Constitution because Appellant does not distinguish those rights from his rights under the Texas Constitution.  
See Dewberry v. State
, 4 S.W.3d 735, 743-44 (Tex. Crim. App. 1999)
 
(addressing only U.S. Constitution because appellant failed to distinguish those rights from rights under Texas Constitution)
, 
cert. denied
, 529 U.S. 1131 (2000).

6:
The English language copy of the rights that Judge Maddock translated for Appellant in Spanish was subsequently admitted as an exhibit after the suppression hearing and Judge Maddock read the rights aloud in English to the jury.  Judge Maddock testified that she routinely used a Spanish translation form that was provided to the City by Tarrant County, and that she used it “day in, day out.”  She testified that she learned English when she was four years old and that her parents, who were originally from Cuba, did not know English. She was not a certified interpreter licensed by the State of Texas.

After the suppression hearing, Judge Maddock additionally testified that she was fluent in Spanish, a native Spanish speaker, and had lived in Barcelona, Spain, and Mexico City, Mexico, for part of her life.

7:
Judge Maddock testified that the only writing on Appellant’s waiver of counsel form when she left was what she had written on the bottom of the document.  Her notation reads, “Unable to sign.  Per court motion, appoint defendant an attorney,” with her signature and the date.  She testified that when she wrote “unable to sign” on State’s Exhibit 48, she was referring to the financial documents that usually need to be completed to determine indigency and that she was waiving the requirement of those documents.  State’s Exhibit 48 was subsequently admitted into evidence for all purposes without objection. 

8:
Apparently, Appellant asked about an attorney only before the interview, in the notation with his waiver of counsel, and at the end of the written statement, with the same notation: “Yo pregunte por un abogado pero tambien quiere hablar con la policia de Arlington.”  The trial court’s interpreter translated this as, “I asked for a lawyer, but also I wanted to speak with the Arlington police.”

9:
He also testified that he was not advised of his right to contact the Mexican Consulate when, after leaving the hospital, he was booked into the Tarrant County jail, or when he was booked into the Dallas County Sheriff’s Department.  In Exhibits 55 and 56, the State presented evidence, admitted for impeachment purposes, that Appellant was notified of his consular rights at both bookings.  On Exhibit 55, the Tarrant County jail consular rights notification sheet, Appellant circled “no” in answer to the question “Do you wish for us to notify the Consulate officer of your country?”  His inmate number is listed on it.  On Exhibit 56, after information about consular rights, there is a check mark next to an option that states, “The person arrested then stated that he did not wish notice of this arrest to be sent to the consular officials of his country.”

10:
A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence.  
Canales v. State
, 98 S.W.3d 690, 693 (Tex. Crim. App.), 
cert. denied
, 540 U.S. 1051 (2003); 
McCown v. State
, 192 S.W.3d 158, 160 (Tex. App.—Fort Worth 2006, pet. ref’d).