ACCEPTED
04-14-00592-cr
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
1/30/2015 4:29:21 PM
KEITH HOTTLE
CLERK

# IN THE FOURTH COURT OF APPEALS
## SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
1/30/2015 4:29:21 PM
KEITH E. HOTTLE
Clerk

## COURT OF APPEALS NO. : 04-14-00592-CR

## TRIAL COURT CASE NO. : 2013CRB000377 L2

### JOAQUIN ALBERTO DAVILA,
#### APPELLANT

### V.

### THE STATE OF TEXAS

### STATE'S BRIEF

**ISIDRO R. ALANIZ**
**DISTRICT ATTORNEY**
**49TH JUDICIAL DISTRICT**

**By: David L. Reuthinger, Jr.**
**Assistant District Attorney**
**Webb County, Texas**
**1110 Victoria St., Ste. 401**
**Laredo, Texas 78040**
**(956) 523-4900**
**(956) 523-5070 (Fax)**
**Bar No. 24053936**
ATTORNEY FOR THE STATE

## IDENTITY OF PARTIES AND COUNSEL

**APPELLANT:**

JOAQUIN ALBERTO DAVILA

Represented by:
OMAR SALINAS
Assistant Public Defender
1110 Washington
Laredo, Texas 78040
Tel: (956) 523-4119
Fax: (956) 523-5009

**STATE:**

THE STATE OF TEXAS

Represented by:
ISIDRO R. ALANIZ
District Attorney, 49th Judicial District
By: David L. Reuthinger, Jr., Assistant District Attorney
Webb County Justice Center, 4th Floor
1110 Victoria St., Suite 401
Laredo, Texas 78040
(956) 523-4951
(956) 523-5070 (Fax)
dreuthinger@webbcountytx.gov

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................2

TABLE OF AUTHORITIES .................................................................4

STATEMENT REGARDING ORAL ARGUMENT ................................6

STATEMENT OF FACTS ...................................................................7
    A. The Eviction.............................................................................7
    B. The Assault..............................................................................9
    C. The Cover-Up.........................................................................10
    D. The Circus.............................................................................13

ISSUES PRESENTED ......................................................................17
  POINT OF ERROR NO. 1/ ISSUE NO. 1 (Facebook Messages):.........17
    SUMMARY OF ARGUMENT ........................................................17
    ARGUMENT AND AUTHORITY....................................................18
    A. Appellant's Issue Deconstructed – What Error Was Preserved? ...18
    B. The Applicable Law................................................................19
    C. Application, Part 1: The Facebook Messenger Conversation Was
    Relevant to Establish Appellant's Consciousness of Guilt ................24
    D. Application, Part 2: The Rebuttal Evidence Was Not Admissible
    Because It Was Offered Only to Attack the Victim's Character .......25

  POINT OF ERROR NUMBER 2 / ISSUE NO. 2 (Sufficiency): ...........28
    SUMMARY OF ARGUMENT ........................................................28
    ARGUMENT AND AUTHORITY....................................................28
    A. Standard of Review................................................................28
    B. Application.............................................................................29
PRAYER...........................................................................................32
CERTIFICATE OF COMPLIANCE......................................................33
CERTIFICATE OF SERVICE .............................................................33

# TABLE OF AUTHORITIES

**Cases**

*Adams v. State*, No. 05-13-00922, 2014 WL 2807978, *2 (Tex. App.—Dallas Jun. 18, 2014) (not designated for publication) ...........................20

*Agbogwe v. State*, 414 S.W.3d 820, 835 (Tex. App.—Houston [1st Dist.] 2013)...............................................................................................24

*Brasse v. State*, 392 S.W.3d 239, 241 (Tex. App.—San Antonio 2012) ...29

*Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (pl. op.) ...31

*Brown v. State*, 657 S.W.2d 117, 119 (Tex. Crim. App. 1983)..................25

*Chambers v. State*, 866 S.W.2d 9, 26–27 (Tex. Crim. App. 1993)............22

*Cueva v. State*, 339 S.W.3d 839, 882 (Tex. App.—Corpus Christi 2011, pet. ref'd)..................................................................................24

*Davis v. State*, 104 S.W.3d 177, 181 (Tex. App.—Waco 2003)................23

*Goodman v. State*, 66 S.W.3d 283 (Tex. Crim. App. 2001)......................30

*Greene v. State*, 928 S.W.2d 119, 123 (Tex. App.—San Antonio 1996)...25

*Hinojosa v. State*, 433 S.W.3d 742, 751 (Tex. App.—San Antonio 2014) ..............................................................................................29, 31

*Holt v. State*, 912 S.W.2d 294, 301 (Tex. App.—San Antonio 1995) .22, 23

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ...........................................29

*Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011)...............................................................................................24

*Kirk v. State*, 199 S.W.3d 467, 478-79 (Tex. App.—Fort Worth 2006) ....20

*Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990)........22

*Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005) ..................21

*Ramirez v. State*, 902 S.W.2d 674, 675 (Tex. Crim. App. 1990)...............26

*Ross v. State*, 678 S.W.2d 491, 493 (Tex. Crim. App. 1984).....................18

*Ruiz v. State*, 891 S.W.2d 302, 304 (Tex. App.—San Antonio 1994, pet. ref'd).........................................................................................30

*Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998) ....................23

*Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012) ........................20

*Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002)....................19

*Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) 24

*West v. State*, 121 S.W.3d 95, 101-02 (Tex. App.—Fort Worth 2003) ......26

*Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) .....................24

**Statutes**

TEX. PENAL CODE § 22.01(a)(1) ................................................................29

TEX. PENAL CODE § 22.01(b)(2) ...............................................................29

**Rules**

TEX. R. APP. P. 33.1(a)............................................................................18

TEX. R. APP. P. 38.1 ..........................................................................18, 19

TEX. R. EVID. 401 ...................................................................................21

TEX. R. EVID. 403...................................................................................21

TEX. R. EVID. 404(a)(2)..........................................................................23

TEX. R. EVID. 405...................................................................................27

TEX. R. EVID. 405(a) .........................................................................23, 27

TEX. R. EVID. 405(b).........................................................................24, 27

TEX. R. EVID. 608(b) .........................................................................14, 23

TEX. R. EVID. 801(d)..............................................................................20

TEX. R. EVID. 801(e)(2)...........................................................................20

**Other Authorities**

Appellant's Brief ....................................................................18, 19, 30, 31

## STATEMENT REGARDING ORAL ARGUMENT

The State waives oral argument.

TO THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS:

This brief is filed on behalf of Appellee, The State of Texas, by David L. Reuthinger, Jr., Assistant District Attorney.

## STATEMENT OF FACTS

### A. The Eviction

On September 27, 2012, Micaela Michelle[1] Lara ran out of her common-law-husband-slash-boyfriend's house, tears streaming down the fresh red bruise on her face. (3 RR 76, 77). Strewn in the yard was all of her clothing and possessions. (3 RR 22). She was holding her little daughter, Alexandria, who was then one year old. (3 RR 23). But her other daughter, Katelyn, was still inside that house. And between mother and daughter was the Appellant, Joaquin Alberto "Albert"[2] Davila. The Appellant had thrown Micaela, and all that she had, out of the house—but he was keeping Katelyn. (3 RR 22-23).

"You're not gonna take her, you're a bad mother[,]" said the Appellant to the devastated Micaela. "[If] you're not taking good care of

---

[1] The anglicized version of her first name is also her middle name. She also uses it as her Facebook name, as will be seen on State's Exhibits 3 through 5. The court reporter occasionally spells her middle name as "Mitchell."

[2] The Appellant also uses the anglicized version of his first name as his Facebook name.

Alexandria[,] why should I let you take my daughter[,] if you're not going to take care of her[?]" (3 RR 23). The Appellant, self-proclaimed guardian of the family, stood there and cussed out the injured Micaela while a home-health aide helped Micaela gather her strewn possessions into the aide's car so that she could drive to her mother's house. (3 RR 23).

Despite being bruised and choked up with tears, and "sad and scared" over what the Appellant had done, Micaela made it to her mother's house thanks to the "palomita" or home-health aide who was driving. (3 RR 24, 22). Her mother, Maria Victoria Barragan, recalled from the witness stand the sight of her daughter, strewn with tears, visibly bruised; it was clear that she had been hit by someone. (3 RR 74-76). Micaela told her mother why her face was bruised: Appellant "Joaquin had hit me." (3 RR 26). Her mother told Micaela to call the police; she did, and Maria remembered that the police cruiser arrived at her house around 11 AM to take her daughter's statement. (3 RR 77).

Officer Andres Maldonado recalled what Micaela looked like when he stepped into the house:

> [When] "I met her she was dressed in [a] T-shirt, shorts. What I noticed the most was the bruise under her left eye. … It was swollen and it was red. It looked puffy like, it was fresh like it just happened. [Micaela] was pretty strange, she was calm, [but also] nervous. She seemed embarrassed about the situation. …. And she told me that she had been assaulted by her common-law husband." (3 RR 82-83).

Micaela then explained to the officer, as she did to the jury, what happened to her:

## B. The Assault

The Appellant's rage was ignited when Baby Alexandria fell off the bed that morning. (3 RR 19). The Appellant heard the commotion from across the house. Since the children's other grandmother, the Appellant's stepmother, and two home-health personnel were in the home, the Appellant closed the door before he approached Micaela. (3 RR 13, 19). Once he had ensured that no other witnesses were present with Micaela and her daughter, he began screaming at Micaela; he called her a "b[*]tch" and "kept saying [she] was a bad mother. [Then, he] got near [her] and punched [her] on the face." (3 RR 20).

Micaela was in shock, unable to speak. (Id.) Finally, she whimpered that it was an accident, that she had not meant to drop Alexandria. The Appellant responded by slapping Micaela on the face. (Id.) She blacked out and fell to the floor. (Id.) The Appellant then began disposing of all of her property. (3 RR 22). As Micaela regained consciousness, she was able to retrieve Alexandria and a bag for her belongings and leave the house. (Id.)

Armed with Micaela's report of the above, the Laredo Police Department apprehended the ogre otherwise known as Appellant Joaquin Alberto Davila. He was there at the police station when Officer Maldonado returned. (3 RR 84). The officer recalled that the Appellant had not a single scratch, bruise, or any other kind of wound. (3 RR 98).

## C. The Cover-Up

In the spring of 2013, Appellant contacted Micaela—not to apologize, but to try to cut a deal. (3 RR 26). She explained that the Appellant offered to let her see her daughter Katelyn, but that "he wasn't going to let me see her until I remove[d] the charges." (3 RR 26). The State introduced screen-shots of a Facebook Messenger conversation between Micaela and the Appellant to corroborate her testimony about the Appellant's attempt to manipulate her into submission:

**Michelle Lara**
r u here so i can go



**Albert Davila**
Que PaSo Micaela???

**Michelle Lara**
ke si ya tas aki



**Albert Davila**
Si toy en laredo pero con todo respeto no te voy ah dejar ver ala nina
gracias

**Michelle Lara**
y ahora porke joaquin



**Albert Davila**
Yo cumplio con lo mio y tu con lo tuyo tu no quieres hablar tocante en
caso respeto ala nina y eso gracias vamonos por la corte

**Michelle Lara**
mijas bday is comein up just want to now if ur ganna let be wth her

**Michelle Lara**
HAPPY BDAY WERITA TODAY U TURN 2 YRZ OLD I LOVE U SO
MUCH YOSE KE AHORA NO TAMOS JUNTAS N I CANT TELL U
HOW MUCH I LOVE U BUT NO MATTER WAT MIJA UR INSIDE OF
ME I THINK ABOUT U EVERY SINGLE DAY MAY UR WISHEZ COME
TRU N HOPE U HAVE FUN ON UR 2ND BDAY MAMAS TE AMO
ERES MI MUNDO I MISS U ALOT  hope u can read it to her joaquin

- 11 -

The conversation shows that Micaela wanted to see Katelyn for her second birthday and to tell her how much she loved her—that she was her world—and how sorry Micaela was that she could not see her (thanks to the Appellant). (State's Ex. 4-5). The court reporter translated the exchange as follows:

**February 10**

Micaela: "Are you already here?" (3 RR 32)

**February 15**

Micaela: "Are you here so I can go?" (3 RR 33)

**February 17**

Appellant: "What happened, Micaela?" (3 RR 33)
Appellant: "Yes, I'm in Laredo, but with all respect, I'm not going to let you see the child." (3 RR 33)

**February 18**

Micaela: "Now why Joaquin?" (3 RR 34)

**April 11**

Appellant: "I complied with mine and you can comply with yours. You do not want to talk about the case in respect to our child, and thank you, let's go to the court." (3 RR 33, 38).

Micaela testified that she understood these messages to mean: "if I wasn't going to remove the charges[,] he wasn't going to let me see my daughter." (3 RR 39). Micaela also testified that the Appellant had indeed told her this

demand personally, before the Facebook messaging occurred. (3 RR 38).

During Micaela's cross-examination, the defense attempted to admit

photographs depicting the victim partying two or three years before the

instant offense. (3 RR 61-63).[3] The State objected to this attempt to put the

victim's character on trial, but the defense insisted that their purpose was

to disprove that their client "was using their daughter as a tool against her

to get these charges dismissed, which he wasn't. [Appellant] was

concerned about what the child would be exposed to given her lifestyle."

(3 RR 63). The trial court sustained the State's relevancy objection and

excluded the Appellant's photos.

### D. The Circus

After presenting the above evidence, the State rested. The defense

then proceeded to put the victim on trial. The Appellant began by sending

in the clowns: he called a former roommate of the victim to testify that

Micaela was a former stripper who had "four or five boyfriends at the

same time." (3 RR 108-09). The State objected and asked the trial court to

shut down this circus because it "[had] nothing to do with the case at

hand." (3 RR 111-12). The defense insisted that their intention was to

"develop[ ] [this witness's] opinion of Micaela's] character."

---

[3] The defense also claimed they had more recent photos, but they did not attempt to admit these. (3 RR 63-64).

Notwithstanding Rule 608(b),[4] the trial court allowed the circus to go on into a side-show about Micaela's boyfriends being connected to the Zetas. (3 RR 112, 114). The former roommate was then allowed to breathe fire on the stand about Micaela "partying all the time" and allegedly stealing from her. (3 RR 115).

The next defense witness was a bit more serious: a CPS investigator. But the defense simply threw the investigator into the circus; Appellant attempted to get the investigator to discuss confidential CPS records to show that the victim was allegedly responsible for making false child-custody complaints about Appellant. But the Appellant had bent the bad-acts rules as far as they could go; the line of inquiry was shut down by both the CPS investigator and the trial court due to confidentiality and total irrelevance to the issues before the jury. (3 RR 125-127).

The defense then called the "palomita," Nohemi Torres Gomez, who was the home-health aide present after the altercation. Here, the defense finally attempted to attack the merits of the case—for a moment. Nohemi testified that, on the morning of September 27, 2012, she heard a loud sound and Alexandria crying; she went to investigate it and saw that

---

[4] TEX. R. EVID. 608(b) (stating that attacks on a witness's character must be limited to opinion or reputation testimony only, not a cavalcade of alleged specific bad acts, like this three-ring circus).

Micaela was there with the baby. (3 RR 131). The defense tried to emphasize that Nohemi had not seen the bruise on Micaela's face, nor had she heard Micaela mention that the Appellant had hit her. (3 RR 131-32). But then the defense changed the channel back to the circus, inviting Nohemi to speculate that Micaela might get in trouble with somebody if she took Alexandria to the doctor about the fall. (3 RR 135). The State ensured through cross-examination that the jury was aware that Ms. Gomez worked for the Appellant and therefore took her orders from said ringmaster. (3 RR 136-37).

And in the center ring, the final act—the biggest, most spectacular distraction from the merits of the case of them all—the defense's closing argument:

> "Now, what the evidence has shown today is that this is a case about a negligent mother who liked to party. And because of that lost custody of her child. And in doing that, she lost her paycheck in the form of child support. And she would do whatever it takes to get that paycheck back."

(3 RR 155). The defense argued that this victim-sliming side show was relevant to the case because of the roommate's testimony that the victim supposedly punched herself in 2013 (a year after the charged offense) in order to frame one of her other boyfriends. (3 RR 115; *see* 3 RR 112-13). But all of this contortion of the rules of evidence could not save the

Appellant. The jury found him guilty of assault with an affirmative family-violence finding. (3 RR 161-62).

Nevertheless, the Appellant insists that the circus must go on—on to San Antonio, down Dolorosa Avenue, and then on remand back to Laredo—because he says the trial court should have suppressed his attempt to buy off the victim via Facebook while giving him even more latitude to slime the victim with specific bad acts. The State responds as follows.

## ISSUES PRESENTED

**POINT OF ERROR NO. 1/ ISSUE NO. 1 (Facebook Messages):**

**Whether trial court abused its discretion by admitting the Facebook messages as relevant evidence of Appellant's guilt, and by excluding Appellant's proposed evidence of the victim's character?**

## SUMMARY OF ARGUMENT

The Facebook messages were admissible as corroboration of Micaela's testimony that the Appellant was using Katelyn as bait to coerce her into dropping the charge that is now before this Court. The messages, and that testimony, were relevant evidence of Appellant's attempt to tamper with a witness (Micaela), and thus, of his consciousness of guilt.

The proposed rebuttal evidence, consisting of demeaning photographs of the victim, was not admissible because it was not relevant as rebuttal evidence; the photographs were taken two or three years before the offense was committed, and before Katelyn was even born. (3 RR 61-62). The photographs were offered simply to show that Micaela was a bad person, and the character of the victim was not relevant to any issue in the case.

## ARGUMENT AND AUTHORITY

## A. Appellant's Issue Deconstructed – What Error Was Preserved?

### 1. Appellant Has Preserved Error Only As To The Relevancy and Prejudicial Potential Of the Messages

The Appellant challenged the admissibility of the Facebook messages at a pretrial hearing and during the trial. (2 RR 14-17, 3 RR 7-8, 28-30). In each case, the only trial-court objections that Appellant made to the Facebook messages were that they were irrelevant to the issues before the jury, were hearsay, and were "extremely prejudicial." Thus, error was not preserved as to the various other objections in the Appellant's brief.[5] TEX. R. APP. P. 33.1(a); *Ross v. State*, 678 S.W.2d 491, 493 (Tex. Crim. App. 1984) ("When no pretrial hearing is held, the defendant must object when the evidence is offered at trial to preserve error on appeal.").

---

[5] Hence, Appellant's parade of horribles about the Facebook messages—they denied him due process, a fair trial, an impartial jury, and so forth—is not properly before the Court. (Ant. Brief at p. 10). These issues were not raised below, nor are they adequately briefed because Appellant has made no serious attempt to cite the law and apply it to the facts. TEX. R. APP. P. 33.1(a), 38.1; *Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003) (holding that a brief was inadequate because it failed to apply the law to the facts). Nor is the issue about the translation of the messages referenced in Appellant's summary of the argument properly raised. (Ant. Brief at p. 3). That issue is not briefed at all; moreover, the record reflects that while counsel for Appellant objected to the translation of one of the messages, counsel did not pursue the objection after the trial court said that it was going to accept the translation as it stood. (3 RR 37-38). In fact, the record appears to show that *defense attorney* Rebecca Davalos gave the Court the final, accepted translation. (3 RR 38).

*2. Appellant Has Not Preserved Error As To The Rebuttal Images*

The Appellant asserts in one sentence in his first issue that "the defense attempted to counter the claims of the prosecution by introducing pictures of Lara surround by bad moral elements and in provocative poses to show why the Appellant did not want Lara around the child but during the trial the court, again, abused its power of discretion and did take these pictures into consideration." (Ant. Brief at pp. 7-8, PDF pp. 12-13). The State submits that this one-sentence argument was not adequate to raise the issue about the rebuttal photographs, which should have been listed as a separate issue and briefed accordingly. TEX. R. APP. P. 38.1; *Swearingen v. State*, 101 S.W.3d at 100. Nevertheless, the State will address the multifarious Issue No. 1 as it was given.

## B. The Applicable Law

*1. The Trial Court's Discretion*

"A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard." *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). Generally, a court of appeals should not

reverse a trial court's ruling "unless that ruling falls outside the zone of reasonable disagreement." *Id*.

## 2. Hearsay

The Appellant next argues that the Facebook Messenger conversation is hearsay.[6] The Appellant's words are non-hearsay admissions of a party opponent. TEX. R. EVID. 801(e)(2). They were also made in response to questions asked by Micaela. Because those questions are *questions*, not statements, Micaela's words did not assert anything and, consequently, were not offered for the truth of the matter asserted and were not within the scope of the hearsay ban. TEX. R. EVID. 801(d); *see Kirk v. State*, 199 S.W.3d 467, 478-79 (Tex. App.—Fort Worth 2006).

---

[6] In support of this argument, the Appellant's Brief segues from hearsay to authentication, a different objection. He incorrectly claims that the Facebook evidence was taken from the Appellant's private timeline (also called a wall or profile), and argues that it was not properly authenticated because the "state did not ask the Appellant if the account was his" and did not get Facebook Inc. to authenticate them. (Ant. Brief at p. 13) (citing *Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012)) (the citation for *Tienda* is incorrectly given as 358 S.W.3d 648 in the Appellant's Brief). *Tienda* states that one way to authenticate an electronic message is "by direct testimony from a witness with personal knowledge" of the contents of the messages. *Tienda*, 358 S.W.3d at 638. Here, the victim authenticated the messages through her testimony that the Facebook messages were in fact messages, not private timeline posts, and that they were sent by the Appellant to her. *Adams v. State*, No. 05-13-00922, 2014 WL 2807978, *2 (Tex. App.—Dallas Jun. 18, 2014) (not designated for publication) (citing *Tienda* and holding that participant in email conversation could testify to authenticate the emails).

### 3. Rule 403

The Appellant also claims that the Facebook Messenger conversation is unfairly prejudicial, presumably intending to invoke the Rule 403 balancing test. TEX. R. EVID. 403. The trial judge has broad discretion to exclude—or not to exclude—relevant evidence if its probative value is substantially outweighed by the danger of prejudicing the jury by confusing the issues. *Id*.; *Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005). A court employs a balancing test to answer this question, considering various factors, which may include: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Prible*, 175 S.W.3d at 733. Answering this balancing test requires a look at why the evidence is probative, or relevant, to the issues in the case, which is the next item to be explained.

### 4. Relevancy

Relevant evidence is any evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." TEX. R. EVID. 401. Evidence which provides a "small nudge toward proving or

disproving some fact of consequence" is relevant, regardless whether the evidence actually proves or disproves a particular fact. *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). In deciding whether evidence is relevant, a court should inquire whether a reasonable person would believe that the evidence is "helpful in determining the truth or falsity of any fact that is of consequence to the lawsuit." *Id*. at 376.

The Appellant also claims (in an inadequately briefed argument) that he should have been allowed to bring in some photographs as rebuttal of the Facebook messages. Appellant does not identify the precise manner in which he would have done the rebuttal—whether he would use the photos to impeach, to show bias, to discredit testimony, and so on. Generally, great latitude should be given to the defendant in showing any fact which would tend to establish ill feelings, bias, motive, and animus upon the part of any witness testifying against him. *Holt v. State*, 912 S.W.2d 294, 301 (Tex. App.—San Antonio 1995). But that latitude presupposes that the Appellant has shown that the fact at issue is actually *relevant* to the impeachment of the witness in question in the first place, for "the burden of showing the relevance of particular evidence to the issue of bias rests on its proponent." *Id*. (quoting *Chambers v. State*, 866 S.W.2d 9, 26–27 (Tex. Crim. App. 1993)). Hence, the trial judge has the discretion and duty to

balance the probative value of the Appellant's proposed impeachment evidence against the risks of undue prejudice, and the trial judge's determination should not be reversed absent a clear abuse of discretion. *Holt*, 912 S.W.2d at 301.

*5. Limitations on Character Evidence*

Whether the evidence is relevant is not the only question, as there are limits on the extent to which evidence of a witness's character may be admitted. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, may not be inquired into on cross-examination, excepting certain convictions of crime. TEX. R. EVID. 608(b). And while Rule 404(a)(2) permits a party in a criminal case to offer "evidence of a pertinent character trait of the victim[,]" TEX. R. EVID. 404(a)(2), Rule 405 limits the reach of Rule 404(a) to opinion or reputation testimony, excluding the use of specific acts—such as the alleged photos from Micaela's Facebook account. *See* TEX. R. EVID. 405(a); *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998); *Davis v. State*, 104 S.W.3d 177, 181 (Tex. App.—Waco 2003). Rule 405(b) permits evidence of specific acts as character evidence only when the

"person's character or character trait is an essential element of a charge, claim or defense." TEX. R. EVID. 405(b).

## C. Application, Part 1: The Facebook Messenger Conversation Was Relevant to Establish Appellant's Consciousness of Guilt

The victim's testimony unambiguously indicates that the defendant attempted to get the victim to drop the charge at bar in return for being able to see her daughter, Katelyn. Any conduct on the part of a person accused of a crime, subsequent to its commission, which indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged. *Cueva v. State*, 339 S.W.3d 839, 882 (Tex. App.—Corpus Christi 2011, pet. ref'd) (citing *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.)). The fact that a defendant has offered something in return for dropping charges is relevant to his guilt because that fact indicates that the defendant has "attempt[ed] to tamper with a witness[, and that] is evidence of 'consciousness of guilt.'" *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011) (citing *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999)); *see also Agbogwe v. State*, 414 S.W.3d 820, 835 (Tex. App.—Houston [1st Dist.] 2013). The use of evidence of threats or

coercion to show consciousness of guilt is one of the permitted grounds for the use of character evidence allowed for by Rule 404(b). *Greene v. State*, 928 S.W.2d 119, 123 (Tex. App.—San Antonio 1996) (citing *Brown v. State*, 657 S.W.2d 117, 119 (Tex. Crim. App. 1983)). As such, Appellant's attempt to coerce Micaela into dropping charges by using Katelyn as bait was highly relevant evidence of his guilt. Thus, the trial court was well within its discretion in deciding to admit it over Appellant's relevancy and Rule 403 objections.

### D. Application, Part 2: The Rebuttal Evidence Was Not Admissible Because It Was Offered Only to Attack the Victim's Character

The Applicant claims that the Facebook photos of Micaela allegedly being a stripper who liked to party were relevant evidence; he asserts that the photographs could have impeached Micaela's testimony, corroborated by the Facebook Messenger conversation, that Appellant wanted to get the charges dropped in return for permitting Micaela to see Katelyn. Appellant's theory was that the photographs showed the real reason for Appellant not wanting Micaela to see Katelyn was that Micaela was allegedly a bad person. However, the photographs were taken years before the instant offense, and before Katelyn was born. (3 RR 61-63). As such, the photographs were not relevant to the issues in the case, and could not

be used to show an alternative reason for the Facebook messages. *See West v. State*, 121 S.W.3d 95, 101-02 (Tex. App.—Fort Worth 2003).

Moreover, this use of the photographs would have been prohibited by the rule that a witness may not be impeached by bringing up a collateral matter. *Ramirez v. State*, 902 S.W.2d 674, 675 (Tex. Crim. App. 1990) (holding State could not bring up a mother's heroin use to impeach her). There is an exception to this rule that applies when a witness has left a false impression regarding his or her credibility. *Id*. at 676. But whether or not Micaela was a bad mother in years past was not relevant to her credibility. *See id*. (holding evidence that witness was a bad mother because she used heroin was not sufficiently related to the issue of whether she had been in trouble with the police to be relevant to rebut other testimony that she had not been in trouble).

Therefore, the real reason the Appellant was using specific acts of the victim (to wit, questionable Facebook posts) was to allege that the victim had bad character; he wanted to corroborate his statement to the victim, "you're a bad mother[,]" without having to take the stand. (3 RR 23). Although the conclusion he wanted to draw from the "you're a bad mother" allegation was that the Appellant sent the messages to Micaela because she was a "bad mother[,]" and not to get her to drop the case, the

fact remains that he wanted to use the character evidence to establish that Micaela was in fact "a bad mother" in order to draw that conclusion. Therefore, to make that point, he needed an exception to Rule 404(a) *and* Rule 405 which would have allowed him to bring up specific acts of Micaela. The alleged character traits of the victim, that the Appellant was trying to show through the posts, were not relevant to an essential element of the charge against Appellant or to any defense that he was raising. TEX. R. EVID. 405(b). Therefore, the Appellant could not use specific-acts evidence such as the Facebook photos to make his point. *Id.* The Appellant has not cited any exception to the general ban on the use of specific acts to show a witness's character. TEX. R. EVID. 405. Therefore, even if the victim's character as a "bad mother" was relevant, the Appellant was limited to proving this up through opinion or reputation testimony only— not through specific acts such as the photographs. TEX. R. EVID. 405(a).

As such, the State respectfully requests that Appellant's first point of error, concerning the admission of the Facebook messages, be overruled.

**POINT OF ERROR NUMBER 2 / ISSUE NO. 2 (Sufficiency):**

**Whether the evidence at trial was legally insufficient to show that Appellant committed the charged offense of assault?**

## SUMMARY OF ARGUMENT

The victim testified that Appellant struck her, causing her to black out and also causing a facial contusion. This alone is legally sufficient proof of both the assault itself and the Appellant's culpability in it. The victim's testimony was corroborated by photographs of the bruise and by the Facebook messages, among other things.

## ARGUMENT AND AUTHORITY

### A. Standard of Review

In evaluating legal sufficiency, the Court should view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Hinojosa v. State*, 433 S.W.3d 742, 751 (Tex. App.—

San Antonio 2014); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Evidence may be insufficient under the *Jackson* standard when "(1) the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense, [or] (2) the evidence conclusively establishes a reasonable doubt[.]" *Brasse v. State*, 392 S.W.3d 239, 241 (Tex. App.—San Antonio 2012) (quotation omitted).

Appellant was charged with the offense of assault by causing bodily injury to a family member. TEX. PENAL CODE § 22.01(b)(2). The essential elements required of this offense are that: (1) the defendant, (2) intentionally, knowingly or recklessly, (3) causes bodily harm to a family member, including the defendant's spouse. TEX. PENAL CODE § 22.01(a)(1).

### B. Application

The information charged the offense as follows:

"on or about the 27th day of September, 2012 A.D. and before the making and filing of this complain[t], in the County of Webb, and State of Texas, Joaquin Alberto Davila … did then and there intentionally, knowingly, or recklessly cause bodily injury to Micaela M. Lara, a 'member of the defendant's family' or 'member of the defendant's household,' or 'person with whom the defendant had or had had a dating relationship,' as described by Section '71.003' or '71.005' or '71.0021(b),' Family Code, **by striking Micaela M. Lara's face with his hand.** Against the peace and dignity of the State.'

(3 RR 9-10) (emphasis added). The Appellant says that the "record is absent of any evidence showing that Appellant struck Micaela Lara (Lara) in the face with his hand." (Ant. Brief at p. 20, PDF p. 15).

However, the Appellant then points out that "Lara claimed that Appellant punched her with a closed fist to the face then slapped her so hard that she fell to the ground and passed out for a couple of seconds." (Id.) (citing 3 RR 18-19). "Direct evidence of 'X' … is … sufficient [proof] to support … [the jury's finding of] 'X' fact." *Goodman v. State*, 66 S.W.3d 283 (Tex. Crim. App. 2001) (an analogous case about evidentiary sufficiency in a family-violence case). Micaela Lara's testimony is direct evidence that Appellant did commit the offense in the manner stated in the information—by striking her in the face with his hand. And a defendant may be convicted on the testimony of one witness. *Ruiz v. State*, 891 S.W.2d 302, 304 (Tex. App.—San Antonio 1994, pet. ref'd) ("[t]he testimony of a victim standing alone, even when the victim is a child, is sufficient to support a conviction for sexual assault.") Thus, based on Micaela's testimony alone, the evidence is legally sufficient. *See id.* Her testimony regarding her injury was corroborated by the investigating officer as well. (3 RR 82-83).

Nevertheless, the Appellant says that no rational juror could have believed Lara's testimony beyond a reasonable doubt because Nohemi Torres said that she did not see an injury on Micaela's face, and that she heard only one person fall to the ground, when the evidence showed that both baby Alexandria and the victim fell. (Ant. Brief at pp. 15-16). Conflicting evidence does not render a conviction legally insufficient. *Hinojosa*, 433 S.W.3d at 751-52. The weighing of credibility or competing inferences is no part of a legal sufficiency review. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (pl. op.). The resolution of these conflicts in the evidence was for the jury. *Id.*

As such, the State respectfully requests that Appellant's second point of error, concerning evidentiary sufficiency, be overruled.

## PRAYER

For the reasons stated above, the State prays that the conviction be AFFIRMED and for general relief.

Respectfully submitted,

ISIDRO R. ALANIZ
DISTRICT ATTORNEY
49TH JUDICIAL DISTRICT

By:___/s/_____
David L. Reuthinger, Jr.
Assistant District Attorney for
THE STATE OF TEXAS
Webb County, 49th Judicial District
1110 Victoria St., Suite 401
Laredo, Texas 78040
(956) 523-4900
(956) 523-5070 (Fax)
Bar No.  24053936
**ATTORNEY FOR APPELLEE**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Rule 9.4, Texas Rules of Appellate Procedure, as amended, and that the word count, less exempt sections, is 5,069.

Date: January 30, 2015

___/s/_____
David L. Reuthinger, Jr.
Attorney for Appellee

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellee's Brief has been delivered to Omar Salinas, attorney for the Appellant, via e-Service or fax to (956) 523-5009.

Date: January 30, 2015

___/s/_____
David L. Reuthinger, Jr.
Attorney for Appellee